CACHIL DEHE BAND OF WINTUN
INDIANS OF THE COLUSA INDIAN
COMMUNITY, a federally
recognized Indian Tribe,

        Plaintiff,

PICAYUNE RANCHERIA OF THE
CHUKCHANSI INDIANS, a
a federally recognized Indian
Tribe,

        Plaintiff
        in Intervention,

    v.

STATE OF CALIFORNIA;
CALIFORNIA GAMBLING CONTROL
COMMISSION, an agency of the
State of California; and
ARNOLD SCHWARZENEGGER,
Governor of the State of
California,

        Defendants.

_____/

NO. CIV. S-04-2265 FCD KJM
(Consolidated Cases)

----oo0oo----

This matter is before the court on defendants State of California, California Gambling Control Commission (the "Commission" or "CGCC"), and Governor Arnold Schwarzenegger's (collectively, the "defendants") motion for judgment on the pleadings against plaintiff Cachil Dehe Band of Wintun Indians of the Colusa Indian Community ("Colusa"), defendants' motion for partial summary judgment against Colusa, Colusa's motion for summary judgment, defendants' motion to dismiss plaintiff-intervenor Picayune Rancheria of the Chukchansi Indians' ("Picayune") complaint, defendants' motion for summary judgment against Picayune, and Picayune's joinder in Colusa's motion for summary judgment. The court heard oral argument on the motions on February 20, 2009.[1] The court allowed the parties to submit supplemental briefing regarding the size of the statewide license pool under the 1999 Compact, the last of which was filed on April 8, 2009.

## BACKGROUND[2]

Plaintiff Colusa is an American Indian Tribe with a governing body duly recognized by the Secretary of the Interior. (Pl.s' Compl. ("Compl."), filed Oct. 25, 2004, ¶ 2). Plaintiff-

---

[1]     By Stipulation and Order, filed March 2, 2009, the court allowed plaintiff Colusa and defendants to file additional cross-motions on summary judgment regarding Colusa's claim for Failure to Negotiate in Good Faith. (Stip. & Order [Docket #93], filed Mar. 2, 2009; see Pl.'s First Am. Compl. [Docket #22 in Case 2:07-cv-1069], filed Feb. 8, 2008). As such, the court does not address herein the merits or the facts relating to this claim.

[2]     Unless otherwise noted, the following facts are undisputed. All parties have filed objections to various pieces of evidence. Except where noted, such evidence is immaterial to the court's analysis of the motions or the objections are otherwise without merit.

intervenor Picayune is also a federally recognized Indian tribe. (Compl. in Intervention, filed Jan. 29, 2009, ¶ 8).  In April 1999, then-Governor Gray Davis ("Davis") invited Colusa and all other federally-recognized tribes in California to a meeting in Los Angeles, at which Davis announced his intention to negotiate a compact allowing Class III gaming with California's tribes. (Defs.' Resp. to Pl. Colusa's Stmt. of Undisp. Facts ("DUF") [Docket #80-3], filed Feb. 6, 2009, ¶ 1).  Colusa was part of a group of approximately 80 tribes that participated in negotiations with the team appointed by Davis.  (Id. ¶ 2).  Colusa attended and was represented by legal counsel at all of the negotiation meetings, the last of which took place in Sacramento on September 9, 1999.  (Id.)

Colusa and Picayune entered into Class III Gaming Compacts (the "Compact") with the State of California (the "State") in 1999.  (Id. ¶ 24; see Tribal-State Compact between Colusa Indian Community and State of California ("Compact"), attached to Stipulated Record of Documentary Evidence ("Stip. R.") [Docket #62], filed Jan. 20, 2009).  The Compact was ratified by the Legislature on September 10, 1999, and both Colusa and Picayune's Compact has been in effect since May 16, 2000.  (See Pl. Colusa's Resp. to Defs.' Stmt. of Undisp. Facts ("PUF") [Docket #79-3], filed Feb. 6, 2009, ¶ 4; DUF ¶ 7; 65 Fed. Reg. 31189-01 (May 16, 2000)).  55 other tribes (the "Compact Tribes") also executed virtually identical compacts with the State.  (Compl. ¶ 24; Letter, Hill to Burton, Stip. R., at 63; see Artichoke Joe's California Grand Casino v. Norton, 353 F.3d 712, 717-18 (9th Cir. 2003); Artichoke Joe's California Grand Casino, 216 F. Supp. 2d

3

1084, 1094 (E.D. Cal. 2002)).  At their core, these compacts authorize Class III gaming pursuant to certain restrictions.

### 1. Limitations on Gaming Device Licenses

The Compact sets forth various provisions relating to the number of Class III Gaming Devices a Compact Tribe may operate. The Compact sets the limit of the amount of Gaming Devices operated by each individual tribe at 2,000.  (Compact § 4.3.2.2(a)).  A tribe must obtain a Gaming Device license for each device it seeks to operate in excess of the number of terminals already operated as of September 1, 1999.  (DUF ¶ 8; Compact § 4.3.1).

The Compact also sets a statewide maximum on the number of Gaming Devices that all Compact Tribes may license in the aggregate.  (Id.)  This statewide maximum is determined by a formula set forth in the Compact.  (Id.; PUF ¶ 3.)  Specifically, the Compact provides:

> The maximum number of machines that all Compact Tribes in the aggregate may license pursuant to this Section shall be a sum equal to 350 multiplied by the Number of Non-Compact tribes as of September 1, 1999, plus the difference between 350 and the lesser number authorized under Section 4.3.1.

(Compact § 4.3.2.2(a)(1)).  Under defendants' calculation of the formula, the license pool consists of 32,151 licenses.  (DUF ¶ 34).  Plaintiffs assert that defendants' interpretation of the Compact is incorrect and that more licenses are available under the equation.

### 2. The License Draw Tier System

The Compact also provides that Gaming Device licenses are distributed among all the 1999 Compact Tribes pursuant to the

4

license draw process. (Compact § 4.3.2.2). Tribes are awarded licenses based upon the tribe's placement in one of five priority tiers. (Id.) Specifically, the Compact provides:

> Licenses to use Gaming Devices shall be awarded as follows:
>
> (i) First, Compact Tribes with no Existing Devices (i.e., the number of Gaming Devices operated by a Compact Tribe as of September 1, 1999) may draw up to 150 licenses for a total of 500 Gaming Devices;
>
> (ii) Next, Compact Tribes authorized under Section 4.3.1 to operate up to and including 500 Gaming Devices as of September 1, 1999 (including tribes, if any, that have acquired licenses through subparagraph (i)), may draw up to an additional 500 licences, to a total of 1000 Gaming Devices;
>
> (iii) Next, Compact Tribes operating between 501 and 1000 Gaming Devices as of September 1, 1999 (including tribes, if any, that have acquired licenses through subparagraph (ii)), shall be entitled to draw up to an additional 750 Gaming Devices;
>
> (iv) Next, Compact Tribes authorized to operate up to and including 1500 gaming devices (including tribes, if any, that have acquired licenses through subparagraph (iii)), shall be entitled to draw up to an additional 500 licenses, for a total authorization to operate up to 2000 gaming devices.
>
> (v) Next, Compact Tribes authorized to operate more than 1500 gaming devices (including tribes, if any, that have acquired licenses through subparagraph (iv)), shall be entitled to draw additional licenses up to a total authorization to operate up to 2000 gaming devices.

(Compact § 4.3.2.2(a)(3)). Defendants placed Colusa in the third draw priority tier for its initial draw on September 5, 2002. (DUF ¶¶ 11-12). Subsequently, it was placed in the fourth draw priority tier and then the fifth draw priority tier. (DUF ¶¶ 17, 24). Colusa contends that it should have been placed in the third draw priority tier for all draws.

/////

### 3. Deposit in the Revenue Sharing Trust Fund

In addition to authorizing Class III gaming, the Compact also provides for revenue sharing with non-gaming tribes. (Compact ¶ 4.3.2.1). The Revenue Sharing Trust Fund ("RSTF") is a fund created by the Legislature and administered by the Commission, as trustee, "for the receipt, deposit, and distribution of monies paid." (Compact § 4.3.2). The revenue sharing provisions of the Compact provide that Non-Compact Tribes shall receive $1.1 million per year, unless there are insufficient funds, in which case, the available monies in the RSTF shall be distributed in equal shares to the Non-Compact Tribes.[3] (Compact § 4.3.2.1).

As a condition of acquiring licenses to operate Gaming Devices, the Compact requires that Colusa deposit in the RSTF "a non-refundable one-time pre-payment fee in the amount of $1,250 per Gaming Device being licensed." (Compact § 4.3.2.2(e)). The Commission applies this pre-payment to a tribe's annual license fees. However, a tribe does not owe annual license fees on any of the first 350 licenses it obtains through the license draw process. (DUF ¶ 51). Colusa has not been required to pay any license fees as is has drawn a total of 323 Gaming Device licenses through the draw process. (See DUF ¶ 52).

### 4. The Conduct of the Parties

Shortly after the conclusion of negotiations in September 1999, and in anticipation of the effectiveness of the 1999

---

[3]     For purposes of revenue sharing, the Compact defines a Compact Tribe as a tribe having a compact with the State authorizing Class III Gaming; Non-Compact Tribes are defined as federally-recognized tribes that are operating fewer than 350 Gaming Devices. (Compact § 4.3.2(a)(1)).

Tribal-State Compacts, many tribes acted pursuant to § 4.3.2.2 of their respective compacts to create a system for issuing Gaming Device Licenses. (DUF ¶ 40). The Sides Accounting Firm ("Sides") administered this initial draw system (the "Sides process"). (Id.) By letter to Sides dated May 10, 2000, Special Counsel to the Governor and the Chief Deputy Attorney General acknowledged that the California Indian Tribes had reached an agreement on procedures for drawing machine licenses and clarified the requirements for the draw system provided in the compacts. (Letter to Sides, Stip. R., at 65-67). Specifically, the letter noted the State's expectation that no more than the available number of licenses would be issued through the Sides process. (Id. at 66-67).

The first Sides process draw occurred on or about May 15, 2000. (DUF ¶ 40). Through the Sides process, 29,398 putative gaming device licenses were issued to 38 tribes between May 15, 2000, and February 28, 2001. (Attachment A to Minutes of CGCC meeting, Stip. R., at 80). Sides also collected the one-time prepayment fees of $1,250 for each license issued in the process as well as some of the license fees that were due on a quarterly basis. (Decl. of Gary Qualset ("Qualset Decl.") [Docket #75-3], filed Feb. 6, 2009, ¶ 3).

However, defendants assert that although repeatedly asked, Sides consistently refused to disclose the Compact Tribes that had engaged it to conduct the draws. (Id. ¶ 4). Sides also consistently refused to disclose the number of Gaming Device licenses issued as well as the nature and source of the payments he presented to go into the RSTF. (Id.)

On or about March 13, 2001, Gray Davis issued Executive Order D-31-01, in which he declared that the Commission had exclusive control over the issue of Gaming Device licensing under the Compact. (DUF ¶ 42). By letter dated March 16, 2002, the Chief Deputy Legal Affairs Secretary to the Governor and the Chief Deputy Attorney General directed Sides to cease any further Gaming Device license draws. (Qualset Decl. ¶ 6). The letter noted that Sides' disclosure of the information relating to the number of licenses issued was necessary for the Commission to carry out its Compact duties as trustee of the RSTF. (<u>Id.</u>; Ex. B to Qualset Decl.). Over the next months, defendants contend that the Commission had difficulties administering the RSTF based upon the lack of accurate and complete information from Sides or the Compact Tribes relating to the licenses drawn and the fees received. (Qualset Decl. ¶¶ 9-10). In August 2001, the Department of Justice, Division of Gambling Control issued an investigative subpoena for production of records relating to the Sides process. (<u>Id.</u> ¶ 10).

However, in December 2001, Sides sent out an announcement that a draw would be conducted on December 31, 2001. (<u>Id.</u> ¶ 13). Sides refused to voluntarily halt the scheduled draw. (<u>Id.</u> ¶ 15). Thus, the Commission sought a temporary restraining order in Sacramento County Superior Court, which was granted on December 28, 2001. (<u>Id.</u> ¶ 12; Ex. G to Qualset Decl.). Pursuant to a settlement agreement effective January 7, 2007, Sides agreed not to conduct further license draws, and the Commission dismissed its action. (<u>Id.</u> ¶ 16; Ex. H to Qualset Decl.).

In June 2002, the Commission declared that the licenses issued through the Sides process were invalid and that they would be replaced by licenses issued by the Commission. (Attachment A to Minutes of CGCC meeting, Stip. R., at 88). Subsequently, the Commission assumed sole responsibility for the administration of the license draw system. (DUF ¶ 10).

Colusa was operating 523 Gaming Devices as of September 1, 1999. (DUF ¶ 9). As such, it was placed in the third priority tier for the first round of draws it participated in on September 5, 2002. (DUF ¶¶ 11-12). Colusa drew 250 licenses from the third tier in the September 2002 draw. (DUF ¶ 14). Colusa tendered a check in the amount of $312,500 as the non-refundable one-time pre-payment fee. (DUF ¶ 48). The Commission conducted another round of license draws on December 19, 2003, and placed Colusa in the fourth priority tier. (DUF ¶¶ 16-17). Colusa requested 377 licenses, but received none because the Commission determined that all available licenses had been issued to the tribes drawing from the first three priority tiers. (DUF ¶¶ 19). On October 21, 2004, the Commission conducted another round of license draws and again placed Colusa in the fourth priority tier. (DUF ¶¶ 20-21). Colusa requested 341 licenses and deposited a pre-payment of $471,200, but received only 73 licenses because too few licenses were available to satisfy Colusa's full request. (DUF ¶¶ 22, 49). The Commission refunded $380,000, but retained $91,250 in pre-payments for the licenses actually received. In every draw subsequently administered, the Commission has assigned Colusa to the fifth (and last) priority tier, and Colusa has not been awarded any more licenses. (DUF ¶

24).  Since the October 21, 2004 draw, Colusa has been authorized
to operate 846 Gaming Devices.  (DUF ¶ 23).  Colusa has made pre-
payments in the amount of $403,750.  (DUF ¶ 52).  However,
because it has only drawn a total of 323 Gaming Device licenses
through the draw process, it has not owed annual license fees.
(See DUF ¶ 51).

By letter dated October 11, 2006, Colusa notified the
Commission of its desire to acquire additional licences and asked
for confirmation that the Commission would conduct a draw within
30 days of receiving the letter.  (DUF ¶ 64).  In August 2007,
Colusa repeated its request for a draw.  (DUF ¶ 66).  However, in
both instances the Commission declined to conduct a draw because,
under its calculations, no licences existed in the statewide
license pool at the time of the requests.  (DUF ¶ 67; see DUF ¶
65).  As such, conducting a draw "would be an empty and futile
act."  (DUF ¶ 67).  As of January 20, 2009, the statewide license
pool contained no available licenses under defendants'
interpretation of the maximum number of gaming devices authorized
under § 4.3.2.2(a)(1) of the Compact.  (Defs.' Stmt. of Undisp.
Facts in Supp. of Mot. for Summ. J. on Picayune's Compl. ("DPUF")
[Docket #67-4], filed Jan. 28, 2009, ¶ 2).

**5.  The Litigation**

On October 25, 2004, plaintiff filed a complaint in this
court, alleging violations of the Compact.  Plaintiff asserts
that defendants violated the Compact by: (1) excluding the Tribe
from participating in the third priority tier in the December 19,
2003 round of draws; (2) unilaterally determining the number of
Gaming Device licenses authorized by § 4.3.2.2(a)(1) of the

Compact; (3) failing to refund money paid pursuant to the non-refundable one-time pre-payment fee set forth in § 4.3.2.2(e) of the Compact; (4) CGCC conducting rounds of draws of Gaming Device licenses without authority; and (5) failing to negotiate in good faith.[4]  On March 28, 2006, defendants filed a motion for judgment on the pleadings, seeking to dismiss plaintiff's first, second, third, and fourth claims for relief for failure to join necessary and indispensable parties and plaintiff's fifth claim for relief for failure to exhaust non-judicial remedies.  By order dated May 16, 2006 (the "May 16 order"), the court granted defendants' motion.

Colusa appealed the court's May 16 order.[5]  The Ninth Circuit reversed the court's ruling that Colusa's first four claims required joinder pursuant to Rule 19 and remanded for further proceedings consistent with its opinion.  <u>Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. ("Colusa") v. California</u>, 547 F.3d 962 (9th Cir. 2008).  The Ninth Circuit's mandate was filed in this court on November 14, 2008.

In the interim, on June 5, 2007, Colusa filed a second action in this court, alleging that defendants violated the Compact by (1) refusing to schedule and conduct a round of draws; and (2) counting multi-station games as equal to the number of

---

[4]     Plaintiff also asserts that the State is violating its obligations under the Indian Gaming Regulatory Act of 1988 ("IGRA") by failing to negotiate in good faith.  (Compl. ¶ 58).

[5]     The Ninth Circuit noted that while Colusa listed its fifth cause of action – failure to negotiate in good faith – among its grounds for appeal, it did not advance any argument in support of reversing the court's order; thus, the Ninth Circuit deemed the claim abandoned.  <u>Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California</u>, 547 F.3d 962, 968 n.3 (9th Cir. 2008).

terminals. (First Am. Compl. in Case No. 2:07-cv-1065 [Docket #22], filed Feb. 8, 2008). Colusa also alleged that defendants failed to negotiate in good faith in violation of both the Compact and the Indian Gaming Regulatory Act, 25 U.S.C. § 2710.

On December 10, 2008, the court consolidated the two actions and set a revised schedule for dispositive motions. On January 2, plaintiff-intervenor Picayune filed a motion to intervene in the action, alleging that the Commission breached its Gaming Compact with the State of California by miscalculating the total number of licenses in the gaming device license pool. (Compl. in Intervention). Defendants opposed the motion to intervene on the sole ground that Picayune's claim was subject to dismissal under Federal Rule of Civil Procedure 19 for failure to join indispensable parties, the very argument rejected by the Ninth Circuit's decision. The court granted Picayune's motion, but maintained the existing schedule for the parties' dispositive motions. (Order [Docket #63], filed Jan. 22, 2009).

**STANDARD**

**A.    Motion to Dismiss**

On a motion to dismiss, the allegations of the complaint must be accepted as true. <u>Cruz v. Beto</u>, 405 U.S. 319, 322 (1972). The court is bound to give plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. <u>Retail Clerks Int'l Ass'n v. Schermerhorn</u>, 373 U.S. 746, 753 n.6 (1963). Thus, the plaintiff need not necessarily plead a particular fact if that fact is a reasonable inference from facts properly alleged. <u>See</u> <u>id.</u>

Nevertheless, it is inappropriate to assume that the plaintiff "can prove facts which it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 526 (1983). Moreover, the court "need not assume the truth of legal conclusions cast in the form of factual allegations." United States ex rel. Chunie v. Ringrose, 788 F.2d 638, 643 n.2 (9th Cir. 1986).

Ultimately, the court may not dismiss a complaint in which the plaintiff alleged "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1973 (2007). Only where a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible," is the complaint properly dismissed. Id. "[A] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002) (quoting Hudson v. King & Spalding, 467 U.S. 69, 73 (1984)).

In ruling upon a motion to dismiss, the court may consider only the complaint, any exhibits thereto, and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201. See Mir v. Little Co. Of Mary Hosp., 844 F.2d 646, 649 (9th Cir. 1988); Isuzu Motors Ltd. v. Consumers Union of United States, Inc., 12 F. Supp. 2d 1035, 1042 (C.D. Cal. 1998).

**B.    Motion for Judgment on the Pleadings**

Rule 12(c) of the Federal Rules of Civil Procedure provides, "After the pleadings are closed – but early enough not to delay

trial – a party may move for judgment on the pleadings."  In
considering a motion for judgment on the pleadings, the standard
applied by the court is virtually identical to the standard for
dismissal for failure to state a claim upon which relief can be
granted pursuant to Rule 12(b)(6).  <u>Fajardo v. City of Los
Angeles</u>, 179 F.3d 698, 699 (9th Cir. 1999).

**C.  Motion for Summary Judgment**

The Federal Rules of Civil Procedure provide for summary
judgment where "the pleadings, the discovery and disclosure
materials on file, and any affidavits show that there is no
genuine issue as to any material fact and that the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c);
<u>see</u> <u>California v. Campbell</u>, 138 F.3d 772, 780 (9th Cir. 1998).
The evidence must be viewed in the light most favorable to the
nonmoving party.  <u>See</u> <u>Lopez v. Smith</u>, 203 F.3d 1122, 1131 (9th
Cir. 2000) (en banc).

The moving party bears the initial burden of demonstrating
the absence of a genuine issue of fact.  <u>See</u> <u>Celotex Corp. v.
Catrett</u>, 477 U.S. 317, 325 (1986).  If the moving party fails to
meet this burden, "the nonmoving party has no obligation to
produce anything, even if the nonmoving party would have the
ultimate burden of persuasion at trial."  <u>Nissan Fire & Marine
Ins. Co. v. Fritz Cos.</u>, 210 F.3d 1099, 1102-03 (9th Cir. 2000).
However, if the nonmoving party has the burden of proof at trial,
the moving party only needs to show "that there is an absence of
evidence to support the nonmoving party's case."  <u>Celotex Corp.</u>,
477 U.S. at 325.

14

Once the moving party has met its burden of proof, the nonmoving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. See Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. See Nissan Fire & Marine, 210 F.3d at 1107. Instead, through admissible evidence the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

## ANALYSIS

### I. Picayune's Complaint in Intervention

Defendants move to dismiss Picayune's complaint on the basis that the claim is outside the applicable statute of limitations.[6] Picayune opposes defendant's motion on the basis that (1) there is no applicable statute of limitations; (2) its complaint relates-back to Colusa's original complaint; and (3) the statute of limitations should be tolled while Colusa's litigation was on appeal.

The Ninth Circuit interprets Rule 24 broadly in favor of intervention. Donnelly v. Glickman, 159 F.3d 405, 409 (9th Cir. 1998). However, it has never addressed whether an intervenor's

---

[6] Defendants also move to dismiss Picayune's complaint for failure to join necessary and indispensable parties under Rule 19 of the Federal Rules of Civil Procedure. Picayune opposes the motion, arguing that the "law of the case" doctrine requires that this court follow the Ninth Circuit's decision holding that the other 1999 Compact tribes are not required Rule 19 parties. Defendants conceded at the hearing that this court is bound by the Ninth Circuit's opinion, and that it brought this argument solely to preserve it on appeal.

15

complaint may relate-back to the original complaint where the statute of limitations has otherwise expired.[7]  Several courts have held that, despite expiration of the applicable statute of limitations, a complaint in intervention filed pursuant to Rule 24 may relate back to the date of an earlier complaint, provided there is no prejudice to the defendant.  See New York v. Gutierrez, No. 08 cv 2503, 2008 WL 5000493 (E.D.N.Y. Nov. 20, 2008); Ross v. Patrusky, Mintz, & Semel, No. 90 Civ 1356, 1997 WL 214957 (S.D.N.Y. Apr. 29, 1997); Greater New York Health Care Facilities Ass'n v. DeBuono, 91 N.Y.2d 716, 721 (1998) (applying New York state law, holding that a party may be permitted to intervene and relate its claim back to the original complaint where (1) the claims are based on the same transaction or occurrence, and (2) the proposed intervenor and the original plaintiff are so closely related that the original plaintiff's claim gave the defendant notice of the proposed intervenor's claim, such that imposition of the intervenor's claim does not prejudice the defendant); see also Cummings v. U.S., 704 F.2d 437, 439-40 (1983) (holding that the intervention of an insurer-subrogee pursuant to Rule 24 was essentially a *pro tanto* substitution of the real party in interest under Rule 17(a), and thus relation-back was appropriate); In re JDS Uniphase Corp. Sec. Lit., No. 02-1486, 2005 WL 2562621 (N.D. Cal. Oct. 12, 2005) (holding that a motion to intervene in a class action suit was

---

[7]    It is well-settled in the Ninth Circuit that a putative member of a class action may intervene in the class action proceeding despite expiration of the applicable statute of limitations, as the intervenor's claim will be deemed to relate back to the filing of the class action.  See, e.g., Bantolina v. Aloha Motors, Inc., 75 F.R.D. 26, 34 (D.C. Hawaii 1977).

timely despite expiration of the statute of limitations where the
intervenor did not seek to add new claims to the original
complaint).

Nevertheless, other courts have applied Rule 24 more
narrowly, holding that a complaint in intervention cannot relate-
back to the original complaint. Federal Rules of Civil Procedure
15(c) and 17(a), which concern amendments to pleadings and
substitutions of real parties in interest, respectively, both
contain explicit relation-back provisions. In contrast, Federal
Rule of Civil Procedure 24 does not. Some courts have
interpreted the lack of an explicit provision in Rule 24 as an
indication that the rule itself does not authorize relation-back.
See Ceribelli v. Elghanayan, No. 91 Civ 3337, 1994 WL 529853, *2
(S.D.N.Y. Sept. 28, 1994). Additionally, courts have been
reluctant to apply the relation-back doctrine where the
applicable statute of limitations has otherwise expired because
it would allow "the courts to start down a slippery slope of
permitting use of the rule as a tactical device to escape the
consequences of the intervenor's prior strategy" and "serve only
to frustrate the 'salutary purpose [of the statute of
limitations] to set stale claims at rest.'"  Id. at *1-2.
According to the Tenth Circuit, those jurisdictions that have not
embraced the relation-back doctrine "have necessarily reasoned
that an intervening plaintiff should not be permitted to
'piggyback' on the claims of an earlier plaintiff in order to
escape the statutory bar that would normally shield a defendant
from liability as to the intervenor." Weber v. Mobil Oil Corp.,
506 F.3d 1311, 1315 (2007) (holding, however, that an

17

intervenor's claim related-back to the date of the original complaint for purposes of a jurisdictional statute where the plaintiff intervenor did not raise new claims or subject the defendants to additional liability); see also Bantolina v. Aloha Motors, Inc., 75 F.R.D. 26, 36 (D.C. Hawaii 1977) (stating, in dicta, that intervention would not necessarily relate-back to the filing of the original complaint where the complaint was filed as an individual action and the statute of limitations had expired).

Generally, courts that have applied relation-back to a complaint in intervention have only done so in narrow and limited circumstances, such as where the underlying rationale of the statute of limitations has otherwise been satisfied.  In Ross, the Southern District of New York held that relation-back was appropriate despite expiration of the statute of limitations where the defendants were not otherwise prejudiced by the intervenor's delay in bringing suit.  1997 WL 214957 at *9.  The court found that other jurisdictions[8] have held that a complaint in intervention otherwise "barred by the statute of limitations relates-back to the date the original complaint was filed where no prejudice to the defendant would result."  Ross, 1997 WL 214957 at *8 (citing Cummings, 704 F.2d at 440; Foster v. Peddicord, 826 F.2d 1370, 1373 (4th Cir. 1987); Red Rock Commodities Ltd. v. M/V Kopalnia Szombierki, No. 92 Civ. 6016, 1994 WL 440822 (S.D.N.Y. Aug. 15, 1994)).  The court held that relation-back was proper because the intervenor's motion for

_____

[8]    The Ross court discussed the Ninth Circuit's decision in Cummings, 704 F.2d 437, which held that the complaint in intervention should relate-back because the policies of Rule 17 were implicated.

intervention had previously been deemed timely by the court, and the intervenor promptly moved for intervention when it became apparent that the plaintiffs could not adequately represent the intervenor's interests. Id. at *9. In stressing the similarity of the parties' claims, the court found that the motion for intervention was essentially a motion for substitution due to the commonality of interest between the intervenor and plaintiff. Id.; see also Cummings, 704 F.2d at 440. Additionally, the court held that the defendants would not be prejudiced by the intervenor's delay in filing suit, and that allowing relation-back under the "circumstances is consonant with the generally permissive spirit of the Federal Rules." Id.[9] In Gutierrez, 2008 WL 5000493 at *13, the Southern District of New York clarified the reasoning of Ross, holding that a complaint in intervention relates-back to the date of the original complaint, despite expiration of the statute of limitations, where "(1) the proposed intervenor is the real party in interest, or there is a 'community of interest' between proposed intervenor's and plaintiff's claims; (2) intervenor's motion is timely within the meaning of Rule 24; and (3) no prejudice to defendants would result." 2008 WL 5000493 at *13.

Statutes of limitations are not designed to punish the plaintiff, but rather protect the defendant from unfair prejudice. As the Tenth Circuit explained in Weber, "The purpose

_____

[9] The Ross court also distinguished a prior district court decision from the Southern District of New York, Ceribelli v. Elghanayan, 1994 WL 529853, because the Cerebelli court held that intervention was untimely. As such, in Cerebelli, to allow relation-back would have flouted the purposes of the statute of limitation in preventing the adjudication of stale claims that had not been pursued.

19

of the statute of limitations is 'to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.'" 506 F.3d at 1315 (quoting <u>Order of R.R. Tels. v. Ry. Express Agency, Inc.</u>, 321 U.S. 342, 348-49 (1944)). Where an intervenor raises the same claim as the original plaintiff, and does not expose the defendant to additional liability, the concerns for "surprise" and "prejudice" are substantially mitigated. <u>JDS Uniphase</u>, 2005 WL 2562621; <u>Ross</u>, 1997 WL 214957 at *8; <u>Gutierrez</u>, 2008 WL 5000493 at *13.

According to defendants, by June 19, 2002, Picayune had notice of defendants' alleged incorrect interpretation of the total number of gaming devices permitted under the Compact. However, Picayune did not file its Motion to Intervene until January 2, 2009. (Compl. in Intervention). On January 22, 2009, this court granted Picayune's Motion to Intervene. (Order [Docket #63], filed Jan. 22, 2009). Defendants seek to dismiss Picayune's complaint in intervention on the basis that California Code Civil Procedure ("C.C.P.") Section 337, which establishes a four-year statute of limitations for breach of contract actions, bars the complaint. (Def.'s P. & A., 4:6-8.)

The court holds that in light of the policy reasons underlying the relation-back doctrine and the unique circumstances presented in this case, Picayune's complaint in intervention relates-back to the date of Colusa's original complaint. Significantly, the three requirements of <u>Ross</u>, which the court finds persuasive, are satisfied. First, there is a

20

"community of interest" between Picayune's and Colusa's claims.
Picayune and Colusa seek the same relief through their respective
breach of contract claims: specifically, declaration of the
correct number of gaming device licenses available pursuant to
Section 4.3.2.2 of the Compact. (Compl., Prayer for 2d Claim for
Relief, ¶ 2; Compl. in Intervention, Prayer for Relief, ¶ 1.)
Colusa and Picayune executed nearly identical Compacts with
defendants; while Picayune does not have a legally protected
interest in Colusa's suit, Picayune and Colusa have a common
interest in the size of the license pool. Further, the
respective disputes over the license pool between the tribes and
defendants arose from the same occurrence: the State's alleged
inaccurate interpretation of the authorized number of gaming
device licenses available to the tribes.

Second, Picayune's motion for intervention was timely within
the meaning of Rule 24. (See Order [Docket #63], filed Jan. 22,
2009). In fact, while defendants objected to Picayune's Motion
to Intervene on the basis of Rule 19, they did not raise any
arguments or objections with respect to timeliness.

Finally, no prejudice to defendants will result if Picayune
is allowed to proceed on its complaint in intervention.
Defendants will not be subject to new liabilities if Picayune's
complaint is related back, for Picayune does not assert claims in
addition to those already raised by Colusa; defendants concede
that the proposed claim, "if not precisely identical, is very
similar to the second claim for relief" in plaintiff's complaint.
(See Order [Docket #63], filed Jan. 22, 2009). Picayune and
Colusa seek the same relief on this claim. Further, permitting

relation-back of Picayune's complaint in intervention would not be prejudicial to defendants since Colusa's claim against defendants was filed in October 2004, and thus defendants have been aware of the legal and factual arguments upon which Picayune's claim is based for four and a half years.[10]

In light of the unique circumstances presented in the instant case, the court finds that Picayune's complaint in intervention relates-back to the date of Colusa's October 2004 complaint. As such, Picayune's complaint in intervention is not barred by the statute of limitations.[11] Therefore, defendants' motion to dismiss is DENIED.

## II. Colusa and Picayune's Claims Against Defendants Arising out of Interpretation of the Compact

In 1998, Congress enacted the IGRA as a "compromise solution to the difficult questions involving Indian Gaming." In re Indian Gaming Related Cases, 331 F.3d 1094, 1096 (9th Cir. 2003) (quoting Artichoke Joe's, 216 F. Supp. 2d at 1092). The principal goal of federal Indian policy generally, and the IGRA specifically is "to promote tribal economic development, tribal self-sufficiency, and strong tribal government. 25 U.S.C. §§ 2701(4), 2702(1). The IGRA also provides a statutory basis "to

---

[10] The court also notes that defendants filed a summary judgment motion in May 2006 which asserted that all of the Compact tribes were Rule 19 necessary and indispensable parties to the Colusa suit. In light of defendants' own motion seeking to join all of the Compact tribes, the court cannot conclude that defendants will be prejudiced if Picayune, merely one of the Compact tribes, is permitted to proceed with its complaint in intervention.

[11] Because the court concludes the Picayune's complaint in intervention relates back to Colusa's original complaint, the court does not reach the issue of what, if any, statute of limitations applies to Picayune's claim.

shield [tribal gaming] from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players." 25 U.S.C. § 2702(2). Moreover, the IGRA serves as a means of granting states some role in the regulation of Indian gaming. Artichoke Joe's v. Norton, 353 F.3d at 715. The "IGRA is an example of 'cooperative federalism" in that it seeks to balance the competing sovereign interests of the federal government, state governments, and Indian tribes, by giving each a role in the regulatory scheme." Artichoke Joe's, 216 F. Supp. 2d at 1092 (quoted in In re Indian Gaming Related Cases, 331 F.3d at 1096); Artichoke Joe's, 353 F.3d at 726 (noting that the legislative history demonstrated that Congress looked to the compacting process primarily as a means of balancing state and tribal interests).

The IGRA creates three classes of gaming, each of which is subject to a different level of regulation. Artichoke Joe's, 353 F.3d at 715; see 25 U.S.C. § 2703(6)-(7) (defining "class I gaming" and "class II gaming"). At issue in this case is class III gaming, which includes "all forms of gaming that are not class I gaming or class II gaming" and is the most heavily regulated form of gaming. 25 U.S.C. § 2703(8); see In re Indian Gaming Related Cases, 331 F.3d at 1097 ("[I]n short, it includes the types of high-stakes games usually associated with Nevada-style gambling . . . [and] is subject to a greater degree of federal-state regulation than either class I or class II gaming."). Pursuant to the IGRA, class III gaming is lawful on

23

Indian lands only if such activities are, inter alia, "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . that is in effect." 25 U.S.C. § 2710(d)(1)(C).

The Tribal-State compact must be negotiated in good faith. 25 U.S.C. § 2710(d)(3). Moreover, state authority over class III gaming is limited by the explicit terms of the applicable Tribal-State compact. <u>Cabazon Band of Mission Indians</u>, 124 F.3d 1050, 1060 (9th Cir. 1997). However, the IGRA also provides that the negotiated compact may include provisions that relate to issues that might affect legitimate state interests, such as the application and allocation of jurisdiction for criminal and civil laws, assessment by the state, taxation by the Indian tribe, remedies for breach of contract, and standards for the operation of gaming facilities. <u>In re Indian Gaming Related Cases</u>, 331 F.3d at 1097; 25 U.S.C. § 2710(d)(3)(C). In California, after a tribe and the Governor negotiate a compact, the Legislature must ratify it. Cal. Const. art. IV, § 19(f); 25 U.S.C. § 2710(d)(8). The Tribal-State compact becomes effective upon the approval of the Secretary of the Interior. 25 U.S.C. § 2710(d).

General principles of contract interpretation apply to Tribal-State compacts. <u>Idaho v. Shoshone-Bannock Tribes</u>, 465 F.3d 1095, 1098 (9th Cir. 2006).[12] "Contract interpretation

---

[12] While general principles of federal contract law should be used to construe a contract governed by federal law, in <u>Shoshone-Bannock</u>, the Ninth Circuit applied Idaho contract law because the parties relied on Idaho contract law and neither the parties nor the court could discern a difference between Idaho and federal contract law. 465 F.3d at 1098. In this case, the parties fail to identify, nor can the court discern, any provision of the Compact that explicitly provides what law is to
(continued...)

begins with the language of the written agreement." <u>Coast Fed.</u>
<u>Bank, FSB v. United States</u>, 323 F.3d 1035, 1038 (Fed. Cir. 2003)
(citing <u>Foley Co. v. United States</u>, 11 F.3d 1032, 1034 (Fed. Cir.
1993)).  A contract must be construed "by reading it as a whole
and interpreting each part with reference to the entire
contract." <u>Tanadqusix Corp. v. Huber</u>, 404 F.3d 1201, 1205 (9th
Cir. 2005); <u>Kennewick Irrigation Dist. v. Unites States</u>, 880 F.2d
1018, 1032 (9th Cir. 1989).  "Contract terms are to be given
their ordinary meaning, and when the terms of the contract are
clear, the intent of the parties must be ascertained from the
contract itself." <u>Shoshone-Bannock</u>, 465 F.3d at 1099 (citing <u>Hal</u>
<u>Roach Studios, Inc. v. Richard Feiner & Co., Inc.</u>, 896 F.2d 1542,
1549 (9th Cir. 1990); <u>City of Idaho Falls v. Home Indem. Co.</u>, 126
Idaho 604 (1995).  "The terms of the contract control, regardless
of the parties' subjective intentions shown by extrinsic
evidence." <u>Tanadqusix</u>, 404 F.3d at 1205; <u>Winet v. Price</u>, 4 Cal.
App. 4th 1159, 1166 (1992) ("It is the outward expression of the
agreement, rather than a party's unexpressed intention, which the
court will enforce.").

Where the terms of the contract are not ambiguous, there is
no genuine issue of material fact.  <u>Tanadqusix</u>, 404 F.3d at 1205
"A contract is ambiguous if reasonable people could find its

---

[12](...continued)
be applied.  However, the Compact does provide that it is entered
into pursuant to the IGRA and that it is intended to meet the
requirements of the IGRA.  (<u>See</u> Compact § 14.)  As such, the
contract is governed by federal law.  <u>See</u> <u>Shoshone-Bannock</u>, 465
F.3d at 1098.  However, the parties rely primarily upon
California contract law and Ninth Circuit opinions applying
California law.  Because the parties fail to identify and the
court does not discern a difference between California and
federal contract law, it accepts that practice.  <u>Id.</u>

25

terms susceptible to more than one interpretation." Id.
Extrinsic evidence may be admitted to construe a written contract
when the language is ambiguous. Winet v. Price, 4 Cal. App. 4th
at 1165. The determination of whether to admit extrinsic
evidence is a two step process. Id. First, the court considers,
without admitting, credible evidence concerning the parties'
intentions to determine whether the language is reasonably
susceptible to a party's interpretation. Id. Second, if the
language is reasonably susceptible to the party's interpretation,
the extrinsic evidence is admitted to aid in interpreting the
contract. Id. (citing Blumenfeld v. R.H. Macy & Co., 92 Cal.
App. 3d (1979)). "[A]mbiguities in a written instrument are
resolved against the drafter."[13] Slottow v. Am. Cas. Co., 10
F.3d 1355, 1361 (9th Cir. 1993). If the language at issue is not
reasonably susceptible to the interpretation urged by the party,
extrinsic evidence should not be considered. Id. ("Further,
parol evidence is admissible only to prove a meaning to which the

---

[13] Colusa asserts that the canon of construction
applicable to the interpretation of statutes affecting Indian
tribes should be applied to the interpretation of the Compact.
In Montana v. Blackfeet Tribe of Indians, the Supreme Court
acknowledged that the canons of construction applicable in Indian
law require that "statutes are to be construed liberally in favor
of the Indians, with ambiguous provisions interpreted to their
benefit." 471 U.S. 759, 766 (1985) (citations omitted).
However, while the Compact was entered into by the parties
pursuant to the IGRA, there is no statutory interpretation issue
raised by Colusa's contract claims. Colusa fails to cite any
authority to support its assertion that the Blackfeet canon of
statutory construction applies to contracts. Cf. Artichoke
Joe's, 353 F.3d at 729 ("[T]he presumption applies only to
federal statutes that are passed for the benefit of dependant
Indian tribes.") (emphasis added) (internal quotation and
citation omitted). Moreover, in a recent Ninth Circuit decision
addressing the interpretation of provisions in a Compact enacted
pursuant to the IGRA, the Blackfeet canon was not applied. See
Shoshone-Bannock, 465 F.3d 1095. Accordingly, the court declines
to apply the Blackfeet canon to Colusa's contract claims.

26

language is 'reasonably susceptible,' not to flatly contradict the express terms of the agreement.") (internal citations and quotations omitted); see also Cabazon, 124 F.3d at 1058 (holding that a strained interpretation of a clear compact provision does not render it ambiguous for purposes of introducing extrinsic evidence).

### A. The Commission's Authority Regarding the Draw Process[14]

In its Fourth Claim for Relief in *Colusa I*, Colusa alleges that "defendants have no authority under the Compact unilaterally to assume control of the Gaming Device license draw process and dictate . . . how and by whom the process will be implemented." (Compl. ¶ 56.) Colusa also alleges that defendants' "usurpation of control over that process" is a substantial violation of the Compact. Defendants move for judgment on the pleadings on this claim, and Colusa moves for summary judgment.

The parties agree that nothing in the Compact explicitly provides any party or entity with the authority to conduct the draw process. Colusa contends that because there is no express provision conferring authority upon the State or the Commission to exercise exclusive control over the calculation or distribution of licenses, the Commission cannot vest itself with such authority. Defendants argue that the provision of the Compact that expressly names the Commission as the Trustee of the RSTF implicitly grants the Commission the authority to administer the statewide license pool.

---

[14]    The court addresses this claim first as the parties have acknowledged this to be a threshold issue at prior appearances before the court.

A trustee is required to "administer the trust with reasonable care, skill, and caution under the circumstances." Cal. Prob. Code § 16040 (West 2009). A trustee also "has a duty to take reasonable steps under the circumstances to take and keep control of and to preserve the trust property." Cal. Prob. Code § 16006 (West 2009). Moreover, a trustee is under a continuing duty to keep accurate accounts of dealings with the trust property, and to render an accounting to a beneficiary on demand. See Cal. Prob. Code §§ 16060, 16062 (2009); In re De Laveaga's Estate, 50 Cal. 2d 480, 487 (1958).

Pursuant to the Compact, the RSTF is funded by money received for one-time pre-payment fees paid as a condition to acquiring licenses and by fees relating to the number of Gaming Devices operated by a tribe. (Compact §§ 4.3.2.2(e), 5.1). Specifically, tribes are required to make a contribution of (1) 7% of the Average Gaming Device Net Win on terminals in excess of 200, up to 500 terminals; (2) 10% of the Average Gaming Device Net Win on terminals in excess of 500, up to 1000 terminals; and (3) 13% of the Average Gaming Device Net Win on terminals in excess of 1000. (Compact § 5.1). The amount of money to be contributed into the RSTF is based upon how many licenses are drawn and upon how many Gaming Devices a tribe operates.

The court holds that the Commission's appointment as Trustee of the RSTF carries with it the authority to administer the draw process. The Commission must have accurate information with respect to the number of licenses issued and to whom in order to properly account for the money that should be deposited in the RSTF. The need for accurate information implicitly requires that

28

the Commission assume responsibility over the distribution of the licenses and the accompanying and subsequent collection of fees.[15]

Moreover, the need for the Commission to assume responsibility of the draw process in order to fulfill its duties as a trustee is illustrated by the circumstances created by the Compact Tribes' use of the Sides process in 2000-2001. The Commission did not control the draw process and thus, was unable to properly account for how many licenses were issued, how much money should be in the RSTF, and how may licenses were given to each tribe through the draw process for purposes of collecting fees. Under these circumstances, the Commission could not fulfill its duties to control, preserve, account, and report the trust property.

Colusa argues that the collaborative process provided for in § 8.4 of the Compact, which requires that State regulations to be applied to a Tribe be developed through a consultative process, should have been utilized prior to the Commission's exercise of control over the draw process. However, § 8.4 applies only to those matters "encompassed by Sections 6.0, 7.0, or 8.0," which relate to the on-site operation of tribal gaming facilities. (Compact § 8.4; see Compact §§ 6-8). The administration of the draw process and the RSTF are set forth in Sections 4.0 and 5.0 of the Compact, sections notably absent from the provisions of § 8.4. Accordingly, Colusa's argument is without merit.

---

[15] The court notes that the authority to administer the draw process does not give the Commission concomitant authority to interpret the Compact. While interpretation issues may and have arisen throughout the draw process, the Commission's role as Trustee does not grant deferential review to its interpretation.

Therefore, with respect to Colusa's claim that the
Commission does not have authority to administer the draw
process, defendants' motion for judgment on the pleadings is
GRANTED, and Colusa's motion for summary judgment is DENIED.

**B.    Number of Gaming Devices Authorized by the Compact[16]**

In its Second Claim for Relief in *Colusa I*, Colusa alleges
that the State of California and the Commission unlawfully
determined the number of Gaming Device licenses authorized by §
4.3.2.2(a)(1) of the Compact.  (Compl. ¶¶ 42-48.)  Specifically,
Colusa contends that the Compact authorizes more licenses than
defendants have determined.  (Compl. ¶ 46.)  Picayune's sole
Claim for Relief also alleges that the correct number of licenses
exceeds the number determined by defendants.  (Intervenor Compl.
¶¶ 58-59.)  Defendants, Colusa, and Picayune have filed motions
for summary judgment on this claim.

The Compact provides, in relevant part:

> The maximum number of machines that all Compact Tribes
> in the aggregate may license pursuant to this Section
> shall be a sum equal to 350 multiplied by the Number of
> Non-Compact tribes as of September 1, 1999, plus the
> difference between 350 and the lesser number authorized
> under Section 4.3.1.

(Compact § 4.3.2.2(a)(1)).  Section 4.3.1 provides that a tribe
"may operate no more Gaming Devices than the larger of . . . (a)
A number of terminals equal to the number of Gaming Devices
operated by the Tribe on September 1, 1999; or (b) Three hundred
fifty (350) Gaming Devices."  For purposes of these sections, the
Compact defines "Non-Compact Tribes" as those "[f]ederally-

---

[16]    The court also takes up this claim out of order as the
parties conceded at oral argument that this issue is at the heart
of the litigation.

recognized tribes that are operating fewer than 350 Gaming Devices. (Compact § 4.3.2(a)(i)). On September 1, 1999, there were 84 federally-recognized tribes in California operating fewer than 350 Gaming Devices. (DUF ¶ 26). As such, the first component of the formula, "350 multiplied by the Number of Non-Compact tribes," is the product of 350 multiplied by 84, or 29,400. (DUF ¶ 27). The parties are in agreement as to this number. (Id.)

The parties' disagreement centers on interpretation of the second aspect of the equation, the difference between 350 and the lesser number authorized under Section 4.3.1. In their original submissions,[17] defendants, Colusa, and Picayune[18] agreed that in order to adjust the equation to apply to all Compact tribes, 350 should be multiplied by a particular number and the resulting number should be subtracted by the aggregate number of devices operated by tribes who had less than 350 devices as of September 1, 1999. They also agreed that 2,849 was the aggregate number of

[17] Colusa raised its alternative theory in a footnote in its original motion and expounded upon it in its reply and during oral argument. The court allowed supplemental briefing on this issue following the hearing.

[18] Picayune also argued that the only limitation on the number of licenses, and thus devices, under the Compact is the limit of 2000 per tribe. However, such an interpretation would render meaningless §§ 4.3.1 and 4.3.2.2(a). As such, this argument is without merit. Moreover, Picayune's reliance on the State's more recent entry into amended compacts that allow for unlimited gaming devices is irrelevant. Defendants' subsequent conduct does not aid in the court's determination of the parties' intent as set forth in the Compact. Furthermore, these amended compacts also involve different financial terms, including revenue sharing with the State, and contain far more demanding environmental protection provisions, including the negotiation of agreements with counties concerning the mitigation of off-reservation impacts. (See Defs.' Additional Request for Judicial Notice [Docket #88-2], filed Feb. 13, 2009).

devices operated by tribes who had less than 350 devices as of September 1, 1999. As such, under these proposed formulations, the number of gaming devices authorized by the Compact is equal to 29,400 + (350x - 2,849). Defendants contend that the appropriate multiplier is 16 because this reflects the number of tribes that were operating less than 350, but more than zero, devices as of September 1, 1999. (See DUF ¶¶ 29, 31-32). Defendants contend that zero cannot be authorized, and thus, tribes that were operating zero devices should not be counted. This would render the total size of the pool at 32,151 licenses. Colusa and Picayune contend that the appropriate multiplier is 84 because this reflects the number of tribes that were operating less than 350 devices, including those tribes operating zero devices, as of September 1, 1999. This would render the total size of the pool at 55,951 licenses.

In their supplemental briefing, Colusa and Picayune submit an alternative method for calculating the statewide license pool (the "alternative formulation"). Under this formulation, in order to determine the "lesser number authorized under Section 4.3.1," the first step is to calculate the total number of licenses authorized under § 4.3.1(a) and then to calculate the total number of licenses authorized under § 4.3.1(b); the smaller number is the "lesser number authorized." Colusa and Picayune contend that this number is 13,650, reached by multiplying 350 by 39, the number of tribes who signed compacts. (See Stip. R. at 67A-B). The difference between 13,650 and 350 is 13,300. Therefore, under the alternative formulation, the total size of the pool is (29,400 + 13,300) 42,700 licenses.

### a. Factual Background Specific to the Claim

After the April 1999 meeting between Davis and the federally recognized tribes, three main groups of tribes coalesced for the purpose of conducting compact negotiations with the State. (Supp. Decl. of George Forman ("Supp. Forman Decl." [Docket #98], filed Apr. 8, 2009, ¶ 5). Colusa and Picayune were part of the largest group, the United Tribes Compact Steering Committee ("UTCSC"), which consisted of more than 60 tribes located throughout California. (Id.) Colusa's counsel, George Forman, was one of the tribal attorneys designated to participate in negotiations as a spokesperson for the UTCSC tribes. (Id. ¶ 6). Judge William A. Norris ("Norris"), then Special Counsel to Governor Davis for Tribal Affairs, acted as the lead negotiator for California. (Decl. of William A. Norris ("Norris Decl.") [Docket #95-3], filed Mar. 19, 2009, ¶ 2). Judge Shelleyanne W.L. Chang ("Chang"), then Senior Deputy Legal Affairs Secretary for the Office of Governor Gray Davis, assisted with negotiations. (PUF ¶ 1).

Negotiations began in April 1999. (Id. ¶ 7). On May 26, 1999, Norris negotiated with the USTSC regarding a discussion document prepared by te state and submitted to the tribes on May 21, 1999. (Id. ¶¶ 8-9). During this negotiation, Norris conveyed the Governor's concern about limiting growth. (Ex. A to Supp. Forman Decl. at 37:17-38:12). However, Norris agreed that he, on behalf of the Governor, had "grave reservations, if not opposition, to a cap in the aggregate." (Id. at 37:1-2). Negotiations continued throughout the summer of 1999. (Norris Decl. ¶¶ 9-10). Norris asserts that during the compact

33

negotiations in August and September 1999, the State's
negotiations team made itself available to meet with every tribal
representative who wanted to participate in the ongoing
negotiations.  (<u>Id.</u> ¶ 10).

During the negotiating process, Norris asserts that he
repeatedly advised the tribes and their attorneys that a
statewide cap of 44,798 Gaming Devices, including those already
in operation by tribes, could not be exceeded.  (<u>Id.</u> ¶ 15).
Wayne R. Mitchum, Chairman of the Colusa Indian Community Council
at all relevant times, concedes that the State's negotiating team
represented that the Governor was committed to imposing
reasonable limits on the expansion of gaming in California;
however, per-tribe and statewide limits on Gaming Devices was not
proposed until early September 1999.  (Decl. of Wayne R. Mitcum
("Mitchum Decl") [Docket #59-6], filed Jan. 20, 2009, ¶¶ 1, 10).
In order to address objections that the Compact inequitably
benefitted tribes who had unlawfully operated substantially more
than 350 Gaming Devices prior to entering into a compact, Norris
and Chang drafted § 4.3.2.2(a)(1), which sets forth an aggregate
pool of available licenses.  (Norris Decl. ¶¶ 15-16).  Meanwhile,
the USTSC held extensive internal discussions about fair and
appropriate minimum allocations of gaming devices, how to set
per-tribe maximum limits, and how to allocate a limited number of
gaming devices.  (Mitchum Decl. ¶ 12).

On September 9, 1999, Norris and Chang presented the draft
of § 4.3.2.2 to a group of tribal attorneys who had played key
roles in the negotiating process.  (<u>Id.</u> ¶ 17).  While one of
these attorneys, Jerome Levine, was a tribal representative for

the USTSC, (Ex. A to Supp. Forman Decl. at 2), there is no
evidence that he was acting on behalf of the USTSC. Later that
evening, Norris presented the entire draft compact to the
assembled representatives of the California Indian tribes for
approval. (Norris Decl. ¶ 18). He asserts that no questions
were asked concerning the number of Gaming Devices authorized
under the compact. (Id.) Mitchum asserts that he heard tribal
leaders and other representatives ask the State's negotiators to
explain the meaning, but the State's negotiators refused to
explain it. (Mitchum Decl. ¶ 16). The State's negotiating team
announced that tribal representatives had until approximately
10:00 p.m. that evening to accept the proposal. (Mitchum Decl. ¶
13). This deadline was later extended until midnight. (Id.)

Once the State's negotiators left the room, Mitchum
participated in an extensive discussion with the other tribal
leaders and attorneys about how many Gaming Devices the proposed
compact allowed. (Id. ¶ 17). Mitchum understood the compact to
authorize approximately 56,000 Gaming Device licenses in addition
to those already being operated by tribes. (Id.) Mitchum signed
the required letter of intent on Colusa's behalf before
expiration of the deadline. (Id. ¶ 13).

On or about September 10, 1999, at the request of the
Governor's Press Office, Chang prepared an information sheet
entitled, "Total Possible Number of Slot Machines Statewide Under
the Model Tribal-State Gaming Compact Negotiated by Governor
Davis and California Indian Tribes." (PUF ¶ 5). The Information
Sheet was made available to the news media and described the
purported intent of § 4.3.2.2(a)(1) of the Compact to authorize a

total of 44,448 slot machines statewide, including those already in operation. (See PUF ¶ 6). As such, the Compact allowed for 23,450 additional licenses. (PUF ¶ 6) Chang asserts that the Governor's Office received no complaints or comments concerning the accuracy of the press release. (PUF ¶ 8).

By letter dated November 9, 1999, Elizabeth G. Hill ("Hill"), writing for the Legislative Analyst, determined that § 4.3.2.2(a)(1) authorized 60,000 machines in addition to those already in operation, for a total in excess of 113,000 machines. (Stip. R. at 60-62). Hill, however, cautioned that "different interpretations of the language in the compact could result in significantly different totals." (Stip. R. at 61). Subsequently, by letter dated December 6, 1999, Hill determined that the total amount of machines authorized statewide was 61,700, including those authorized under the Compact and those in operation, based upon the proposed assumption that § 4.3.2.2(a)(1) applies only to 15 tribes.[19] (Stip. R. at 64).

By a letter to Sides dated May 10, 2000, Norris and Peter Siggins ("Siggins"), the Chief Deputy Attorney General, stated that the total number of devices authorized statewide was 45,206, and that 15,400 licenses were available under the Compact for the draw. (Stip. R. at 65-67). However, between May 15, 2000 and February 28, 2001, Sides issued 29,398 Gaming Device Licenses to 38 Compact tribes. (Stip. R. at 80).

By letter to Governor Davis, the Chairman of the Commission, and the Attorney General, dated July 31, 2001, Picayune and other

---

[19]    The parties agree that this number should be 16, not 15.

Compact tribes addressed the "need for confirmation that the maximum number of machines that all Compact Tribes in the aggregate may operate pursuant to the licenses issued per the Tribal-State Compact § 4.3.2.2, is in excess of 113,000." In the alternative, the letter stated that the parties needed to otherwise determine the number of licenses available in the pool. (Ex. O to Decl. of John Peebles ("Peebles Decl.") [Docket #70], filed Jan. 28, 2009).

In June 2002, after reviewing various formulations including those advanced by the Legislative Analyst, the Commission determined that the license pool authorized by the Compact authorizes 32,151 Gaming Devices. (Stip. R. at 87). The Commission's report relies upon the same formulation relied upon by defendants in this litigation. (Stip. R. at 86-87). However, the Commission noted that a different formulation, advanced by the Legislative Analyst, yielded a total pool of 55,951 Gaming Devices and that yet another formulation, advanced by the Tribal Alliance of Sovereign Indian Nations, yielded a total pool of 64,283 Gaming Devices. (Stip. R. at 87). In 2003, Colusa sought to negotiate with the state regarding its interpretation of § 4.3.2.2. (Stip. R. at 92-94).

### b. Analysis

"Contract terms are to be given their ordinary meaning, and when the terms of the contract are clear, the intent of the parties must be ascertained from the contract itself." Shoshone-Bannock, 465 F.3d at 1099. "Although the intent of the parties determines the meaning of the contract, the relevant intent is objective – that is, the objective intent as evidenced by the

words of the instrument, not a party's subjective intent." <u>Badie v. Bank of Am.</u>, 67 Cal. App. 4th 779, 802 n.9 (1998) (internal quotations and citation omitted). Extrinsic evidence may be admitted to construe a written contract when the language is ambiguous. <u>Winet</u>, 4 Cal. App. 4th at 1165.

Where the language is reasonably susceptible to the interpretations offered by both sides, the court must apply the appropriate canons of statutory construction. <u>Badie</u>, 67 Cal. App. 4th at 800. The court must consider the contract as a whole and may also "consider the circumstances under which an agreement was made." <u>Id.</u> The court should "provide an interpretation that will make an agreement lawful, operative, definite, reasonable, and capable of being carried into effect, and must avoid an interpretation that would make it harsh, unjust or inequitable." <u>Id.</u> Words should be given their ordinary meaning. <u>Id.</u> If ambiguity still remains, "the language of the contract should be interpreted strongly against the party who caused the uncertainty to exist." <u>Buckley v. Terhune</u>, 441 F.3d 688, 695-96 (9th Cir. 2006); <u>see</u> <u>Badie</u>, 67 Cal. App. 4th at 800.

The parties do not dispute that the meaning of § 4.3.2.2(a) is unclear and susceptible to varying interpretations. Defendants contend that their formulation is the most reasonable. Colusa and Picayune also assert that their formulation is the most reasonable and that such formulation is further supported because persistent ambiguities must be construed against the drafter, which in this case, was the State.

The court finds that Colusa and Picayune's alternative formulation, which yields a total statewide pool of 42,700, is

38

supported by the contract language and the principles of contract interpretation. First, the circumstances under which the Compact was entered into does not aide the court in discerning the parties' intent.[20] Indeed, the submissions of the parties reveal that there was no clear consensus between the parties regarding the maximum number of Gaming Devices allowed under the Compact at the time the agreements were executed. Defendants present evidence that the State's intention was to limit the aggregate number of devices at approximately 45,000, including those already in operation at the time the compacts were signed. As such, only approximately 23,000 devices would be authorized under the Compact.[21] In contrast, Colusa presents evidence that its Chairman understood the Compact to provide for approximately 55,000 additional licenses at the time he signed the Compact.

Furthermore, the evidence demonstrates that there was no consistent course of conduct between the parties and that there continued to be debate about the number of devices authorized under the Compact. Hill, on behalf of the Legislative Analyst, noted that the language could be interpreted to authorize up to an additional 60,000 Gaming Devices or approximately 60,000

---

[20] None of the parties proffer any evidence or argument that other provisions in the Compact aid in the court's interpretation of this provision.

[21] Significantly, no party proffers an interpretation of the Compact that substantiates this number. Rather, the Commission rejected Norris' interpretation of the Compact, which assumed "that uncompacted tribes have permanently waived their right under Compact § 4.3.1 to deploy up to 350 gaming devices following entry into a Compact with the State." The Commission noted that such an interpretation contradicts the express language of § 4.3.1. (Stip. R. at 86). The court is not persuaded that Commission's formulation is most reflective of the parties' intent based upon its piecemeal reliance on Norris' interpretations.

39

Gaming Devices total. Norris and Siggins informed Sides that only approximately 15,000 licenses were available to be drawn as of May 10, 2000. However, almost 30,000 licenses were ultimately distributed to the tribes through the Sides process. Picayune, among other tribes, sought clarification of the license pool almost two years after entering into the Compact. Furthermore, the Commission only clarified the State's current position with respect to the license pool in June 2002, after considering two other potential formulations that had been advocated by different entities or individuals. Accordingly, the court finds that the extrinsic evidence does not reveal a plain intent or meaning that was either understood by the parties at the time the Compact was executed or followed by the parties in their subsequent relationships.[22]

Second, the alternative formulation provides a lawful, operative, definite, and reasonable interpretation of the Compact. While it is clear that defendants believe that their formulation is better, they have proffered no evidence that an alternative interpretation is harsh, unjust, or inequitable.

Third, among the three calculations proffered by the parties, the alternative formulation most accurately follows the language of § 4.3.2.2(a)(1), giving the words their ordinary meaning. As set forth above, the dispute between the parties

---

[22] The court also rejects defendants' assertion that Colusa and Picayune accepted defendants' interpretation by silence. As an initial matter, there is evidence that the parties had conflicting understandings with respect to the meaning of § 4.3.2.2.(a)(1) when the Compact was signed. Furthermore, Colusa and Picayune's conduct, as set forth above, in the face of the State's numerous and conflicting interpretations cannot reasonably be characterized as silence and/or acceptance.

40

arises out of the interpretation of the second part of the equation, "the difference between 350 and the lesser number authorized under Section 4.3.1." The alternative formulation starts out with the basic determination of "the lesser number authorized." Under § 4.3.1, tribes may not operate more than the larger of (a) the number of devices they were operating on September 1, 1999 or (b) 350 devices. It is undisputed that as of September 1, 1999, 23 tribes were operating more than 350 devices, totaling 16,156 devices in the aggregate. As such, the total number authorized under § 4.3.1(a) is 16,156. 39 other tribes, which were operating less than 350 licenses, signed 1999 compacts. (See Stip. R. 67A-B).[23] By the plain language of the Compact, all of these tribes were "authorized" to operate at least 350 Gaming Devices. (Compact § 4.3.1). Therefore, the total number of devices authorized under § 4.3.1(b) is 39 multiplied by 350, which results in 13,650. (See also Stip. R. at 65). The lesser number authorized under § 4.3.1 is 13,650 because it is a smaller number than 16,156. Next, the Compact calls for the difference between 350 and the lesser number authorized.[24] The difference between 350 and 13,650 is 13,300. That number is to be added to the formula's first part, which the parties agree is 29,400. Therefore, the total number of Gaming

---

[23] Defendants contention that Colusa has not submitted admissible evidence that 39 tribes, which operated fewer than 350 devices, signed compacts is without merit. Pages 67A-B of the Stipulated Record reflect that 23 Non-Gaming tribes signed compacts and that 16 tribes that operated less than 350 devices signed compacts. (See also Stip. R. at 65-66).

[24] The court notes that the language of the Compact does not provide that a number must be subtracted from 350.

Devices authorized under § 4.3.2.2(a)(1) of the Compact is the sum of 29,400 plus 13,300, which equals 42,700.

Both defendants' and plaintiffs' other formulations force a more strained reading of the Compact language. Both of these formulations require that 350 be multiplied to an undetermined number, either 16 or 84. This multiplier is not provided for by the language in § 4.3.2.2(a)(1). Under defendants' interpretation, only the 16 tribes that were operating devices as of September 1, 1999 were "authorized" to conduct Gaming Devices. However, under the plain language of the Compact, any tribe that signed a Compact was authorized to operate Gaming Devices. On the other hand, Colusa and Picayune's original interpretation sought to multiply 350 by 84, the number of non-Compact tribes who operated less than 350 devices, even if many of those tribes did not sign a compact. Because tribes who did not sign a compact could not be "authorized" under that compact, this interpretation also reads out an essential term.[25] In contrast, the alternative formulation gives the term "authorized" its plain meaning.

Moreover, the alternative formulation is supported by the purpose of the latter half of the equation as clarified by defendants' counsel at oral argument. (Hr'g Tr. at 70-71). Defendants' counsel stated that the second part of the equation relates to the "unused entitlement," referring to the devices

---

[25] Moreover, the alternative formulation provides an explanation for the different use of language in the first and second parts of the equation. The first component requires that all 84 Non-Compact tribes be considered, with or without a compact, while the second component requires consideration of only those tribes that have signed a compact.

42

that were authorized that were currently not being used by those tribes operating less than 350 devices as of September 1, 1999. Defendants' counsel explained that the second part of the equation was meant to add those unused authorized devices into the available pool.[26] (Hr'g Tr. at 70:15-71:2). However, defendants' counsel did not explain either in the submissions or at oral argument why only those who were operating some devices should be counted for purposes of calculating the "unused entitlement." Rather, in order to fully account for these unused authorized devices, the equation should take into account those tribes who signed a compact but were not operating any licenses. The alternative formulation does.

Finally, the alternative formulation is consistent with the principle that ambiguities in the Compact are to be construed against the drafter. While the parties dispute the level of negotiation and input that Colusa and Picayune had in the formation of the Compact, it is undisputed that the State's negotiation team actually drafted the language in the Compact.

Therefore, with respect to Colusa and Picayune's claim regarding the number of Gaming Devices authorized under the Compact, defendants' motion for summary judgment is DENIED, and Colusa's and Picayune's motions for summary judgment are GRANTED. The court concludes that the statewide license pool authorizes 42,700 Gaming Devices.

---

[26] The court notes that this rationale appears to be contrary to the Commission's finding in its June 2002 Report. (Stip. R. at 86). However, even without this basis, the court still concludes that the alternative formulation reflects the intention of the parties as set forth by the language in the Compact.

## C.  Colusa's Priority in the Draw Process

In its First Claim for Relief in *Colusa I*, Colusa alleges that its placement in the fourth and fifth priority tiers was a violation of § 4.3.2.2(a)(3) of the Compact.  (Compl. ¶¶ 37-41.) Defendants move for judgment on the pleadings on this claim, and Colusa moves for summary judgment.

The Compact provides, in relevant part:

(i)  First, Compact Tribes with no Existing Devices (i.e., the number of Gaming Devices operated by a Compact Tribe as of September 1, 1999) may draw up to 150 licenses for a total of 500 Gaming Devices;

(ii)  Next, Compact Tribes authorized under Section 4.3.1 to operate up to and including 500 Gaming Devices as of September 1, 1999 (including tribes, if any, that have acquired licenses through subparagraph (i)), may draw up to an additional 500 licences, to a total of 1000 Gaming Devices;

(iii)  Next, Compact Tribes operating between 501 and 1000 Gaming Devices as of September 1, 1999 (including tribes, if any, that have acquired licenses through subparagraph (ii)), shall be entitled to draw up to an additional 750 Gaming Devices;

(iv)  Next, Compact Tribes authorized to operate up to and including 1500 gaming devices (including tribes, if any, that have acquired licenses through subparagraph (iii)), shall be entitled to draw up to an additional 500 licenses, for a total authorization to operate up to 2000 gaming devices.

(v)  Next, Compact Tribes authorized to operate more than 1500 gaming devices (including tribes, if any, that have acquired licenses through subparagraph (iv)), shall be entitled to draw additional licenses up to a total authorization to operate up to 2000 gaming devices.

(Compact § 4.3.2.2(a)(3)).  Colusa was originally placed in the third priority tier for the first round of draws it participated in because it was operating 523 Gaming Devices as of September 1,

1999.[27]   Colusa drew 250 licenses from the third tier.

Defendants then placed Colusa in the fourth tier, where it

eventually received only 73 of the 341 licenses it requested.

Subsequently, Colusa has been placed in the fifth tier, where it

has not received any of the licenses it has requested.

Colusa contends that under the tier system, it should be

allowed to stay in tier three until it has drawn 750 licenses

from that tier.  As such, it should not have to move into the

next tier until it has a total of 1,273 licenses.  Defendants

contend that the parenthetical language in § 4.3.2.2(a)(3) is an

alternative basis for moving a tribe into the next tier.  As

such, to the extent a tribe draws any licenses from the prior

tier, it must draw from the next tier in a subsequent draw.

The terms of a contract are to be given their ordinary

meaning and the intent of the parties are to be based upon the

words of the instrument.  Shoshone-Bannock, 465 F.3d at 1099;

Badie, 67 Cal. App. 4th at 800.  Furthermore, the contract must

be read as a whole and interpreted consistently with the other

terms in the contract.  Tanadgusix, 404 F.3d at 1205.

The court concludes that Colusa's interpretation of §

4.3.2.2(a)(3) is the only reasonably susceptible interpretation

of the Compact that gives full effect to the language of the

provision.  The description of the first three tiers begins with

a restriction based upon the number of devices that a tribe was

operating as of September 1, 1999.  (Compact § 4.3.2.2(a)(3)(i-

iii)).  The parenthetical language in the restriction serves to

_____

[27]   Colusa does not take issue with its original placement
in the third tier.

45

clarify that a tribe could also get into that tier through drawing in a prior tier. The latter part of the description for each tier then provides the number of licenses a tribe may draw from that tier. (Id.) Significantly, in tier three, the Compact language provides that a tribe "shall be entitled to draw up to an additional 750 Gaming Devices." (Compact § 4.3.2.2(a)(3)(iii)). The explicit language thus grants Colusa the right to draw 750 Gaming Devices from the third tier. This is consistent with the language describing the fourth and fifth tier. The description of these tiers does not include a numerical restriction based upon the number of licenses a tribe held on September 1, 1999. (Compact § 4.3.2.2(iv-v)). Moreover, they do not set forth a range of numbers. Rather, they allow a tribe to draw in that tier so long as it has not exceeded the threshold number. (Id.)

A review of how the tier system would work demonstrates how Colusa's interpretation creates a lawful, operative, definite, and reasonable implementation of the contract language. See Badie, 67 Cal. App. 4th at 800. Under the facts provided by Colusa's circumstances, a tribe would be initially placed in the third tier because it had 523 licenses on September 1, 1999. It would then be allowed to draw in the third tier until it has drawn 750 total licenses. This may occur over numerous draws. Once the tribe has drawn 1273 licenses, it would be placed in tier four because it is authorized to operate up to and including 1500 devices.[28] It may then draw in tier four until it has drawn

---

[28]     Further, the parenthetical language in tier four would clearly apply because Colusa drew in tier three.

46

500 licenses.  At that point, now in possession of 1773 licenses, the tribe would draw in tier five, until it has reached the Compact maximum of 2000 licenses.

In another hypothetical, a tribe could enter the draw system with 775 devices as of September 1, 1999.  That tribe would be placed in tier three and allowed to draw until it had reached 1525 licenses.  However, instead of moving to tier four, that tribe would move directly to tier five because it was authorized to operate more than 1500 devices.

Colusa's interpretation is also supported by the circumstances under which the Compact was made.  It is undisputed that the tier system was implemented to "level the playing field" between those tribes that operated several gaming devices as of September 1, 1999 and those that operated few or none.  (See Defs.' P.&A. in Supp. of MJOP [Docket #60-3], filed Jan. 20, 2009, at 7; Pl.'s P.&A. in Opp'n to Def.'s MJOP [Docket #78], filed Feb. 6, 2009, at 5).  Allowing those tribes with less licenses to have better draw priority until they obtained greater parity to those tribes with more licenses serves this purpose.[29]

Conversely, defendants' interpretation of § 4.3.2.2(a)(3) is not supported by the principles of contract interpretation.  Their interpretation fails to accord words their plain and ordinary meaning.  For example, defendants contend that the parenthetical language imposes a restriction separate and apart from the number of devices a tribe is operating.  However, a parenthesis is defined as "an amplifying or explanatory comment

_____

[29]    Furthermore, to the extent that the language is ambiguous, such ambiguity should be construed against defendants as drafter of the Compact.

47

inserted in a passage to which it may be grammatically unrelated." Webster's Third New International Dictionary 1641 (1971). As an amplifying or explanatory term, it cannot function as a wholly separate restriction. Further, defendants' interpretation also equates the term "including" to "or." To "include" is "to place, list, or rate as a part or component of a whole or of a larger group, class, or aggregate." Id. at 1143. However, defendants' seek to impose upon the term a meaning that would allow it to introduce an alternative restriction, not one potentially encompassed by the prior. Finally, defendants' interpretation also wholly reads out the phrase "shall be entitled." The term "shall" indicates a command and the term "entitle" means to give a right. Id. at 758, 2085. The phrase, in the context of the Compact, means that a tribe has a concrete and explicit right to draw 750 licenses in the third tier, 500 licenses in the fourth tier, and 500 licenses in the fifth tier.[30] (Compact § 4.3.2.2(a)(3)(iii-v)).

Further, defendants' interpretation also has the potential for harsh and inequitable results. See Badie, 67 Cal. App. 4th at 800. Theoretically, a tribe could draw one license in the third tier, potentially because only one license was available for draw, and then be forced to move into the fourth tier. As such, through no fault of its own, a tribe would give up draw priority for a de minimis benefit.

Moreover, defendants' interpretation does not serve the purposes set forth by other provisions in the Compact. While

_____

[30]     By its clear terms a tribe cannot exceed 2000 licenses under any circumstance.

48

defendants argue that their interpretation encourages tribes to reach parity as soon as possible, the hoarding of licenses that their interpretation encourages is explicitly denounced by other provisions in the Compact. Under § 4.3.2.2(e), the license for any Gaming Device is cancelled if not placed in commercial operation within twelve months of its issuance. Accordingly, tribes cannot stockpile licenses and wait until it is financially viable to put them into use. Rather, this section encourages tribes to only obtain the amount of licenses that it can promptly put to use. However, defendants' interpretation, which would encourage tribes to obtain as many licenses as possible in a tier so as not to lose draw priority and potentially the ability to obtain any more licenses, directly contravenes the purpose reflected in § 4.3.2.2(e).

Therefore, with respect to Colusa's claim regarding its priority status in the draw process, defendants' motion for judgment on the pleadings is DENIED, and Colusa's motion for summary judgment is GRANTED. Colusa should have remained in the third tier until it had drawn 750 licenses from that tier.

### D.   Retention of Annual Gaming Device License Fees

In its Third Claim for Relief in *Colusa I*, Colusa alleges that it is entitled to a refund of its one-time prepayment of $1,250 for each Gaming Device license the Tribe draws during a round of draws. (Compl. ¶¶ 50-52.) Defendants and Colusa both move for summary judgment on this claim.

The Compact provides, in relevant part, that "[a]s a condition of acquiring licenses to operate Gaming Devices, a non-refundable one-time pre-payment fee shall be required." (Compact

§ 4.3.2.2(e)). These fees are deposited in the RSTF. (<u>Id.</u>) The Compact further provides that "[t]he Commission shall have no discretion with respect to the use or disbursement of the trust funds." (<u>Id.</u> § 4.3.2.1(b)). Under the Compact, the Commission is allowed only "to disburse [the funds] on a quarterly basis to Non-Compact Tribes." (<u>Id.</u>)

Colusa argues that because the prepayment fees are used as a credit towards future annual license fees, and because Colusa does not owe any such fees, defendants should refund the money Colusa has paid into the RSTF. Defendants argue that the Compact expressly provides that the prepayment fees paid into the RSTF are non-refundable and that the Commission has no authority to refund the unused fees to Colusa.

Contract terms must be given their ordinary meaning. <u>Shoshone-Bannock</u>, 465 F.3d at 1099. The court's objective in analyzing the language in a contract "is to determine and to effectuate the intention of the parties." <u>Winet</u>, 4 Cal. App. 4th at 1166. Parol evidence may be used to demonstrate that language is susceptible to a particular meaning, but "not to flatly contradict the express terms of the agreement." <u>Id.</u> at 1167; <u>see</u> <u>Coast Fed. Bank</u>, 323 F.3d at 1040 (holding that the plaintiff could not rely on extrinsic evidence to contradict the plain language of the agreement).

Colusa's suggested interpretation of the Compact flatly contradicts the express terms of the agreement. The Compact expressly provides that the fee is *non-refundable*. Colusa has not offered any extrinsic evidence that would render the term non-refundable reasonably susceptible to an interpretation that

allows for a refund. Rather, the essence of Colusa's argument is that it is unfair for the money to be kept in the RSTF fund if Colusa does not owe any annual license fees for the money to be credited towards. However, there is no provision in the Compact that allows the Commission to disburse money back to a tribe merely because it is not presently being used. Indeed, the Commission has no discretion with respect to the disbursement of the trust funds.

Therefore, with respect to Colusa's claim for a refund of the one-time prepayment of $1,250 for each Gaming Device license drawn, defendants' motion for summary judgment is GRANTED, and Colusa's motion for summary judgment is DENIED.

**E.    Refusal to Schedule and Conduct a Round of Draws**

In its First Claim for Relief in *Colusa II*, Colusa alleges that defendants materially breached the Compact by their refusal to schedule and conduct a round of draws promptly after receiving notice of Colusa's desire to acquire additional licenses. (Am. Compl. ¶ 31.) Defendants and Colusa both move for summary judgment on this claim.

Colusa argues that summary judgment should be granted because it has requested rounds of draws that defendants refused to conduct. In turn, defendants argue that summary judgment should be granted because, under its interpretation of § 4.3.2.2(a)(1), there were no licenses to be issued and thus, conducting a draw would be an "empty and futile" exercise.

By letter dated October 11, 2006, Colusa notified the Commission that it wished to acquire Gaming Device licenses through a properly conducted draw. (Stip. R. at 143-44). By

letter dated October 23, 2006, the Commission responded to this letter, stating that the Commission "will continue to conduct draws as licenses become available and will provide adequate notice to all Tribes eligible to participate." (Stip. R. at 145-46). Subsequently, by letter dated June 8, 2007, the Commission notified Colusa that it would conduct a draw on August 10, 2007; Colusa did not receive any licences. (Stip. R. at 162-64). Thereafter, by letter dated August 14, 2007, Colusa again notified the Commission that it wished to acquire Gaming Device licenses through a properly conducted draw. (Stip. R. at 172-73). By letter dated August 17, 2007, the Commission responded that no licenses were available and therefore, conducting a draw would be "an empty and futile act." (Stip. R. at 178-79). However, the Commission also provided that it would promptly hold another draw once licenses became available.

In this case, defendants were operating under the assumption that they could not issue any more Gaming Device licenses based upon their interpretation of the size of the pool under § 4.3.2.2(a)(1). As such, administration of the draw would have been futile because no licenses were available. See Hackfeld v. Castle, 186 Cal. 53, 57 (1921) ("[W]herever a contract requires for its performance the existence of a specific thing . . . such impairment of it as makes it unavailable, excuses the promisor unless he has clearly assumed the risk of its continued existence."). As set forth above, defendants were mistaken in their interpretation. Through this litigation and this order, the court has clarified that the statewide license pool

authorizes 42,700 Gaming Devices to 1999 Compact Tribes, more
than what was available under defendants' interpretation.

"The role of the courts is 'neither to issue advisory
opinions nor to declare rights in hypothetical cases, but to
adjudicate live cases or controversies.'" <u>Maldonado v. Morales</u>,
556 F.3d 1037, 1044 (9th Cir. 2009) (quoting <u>Thomas v. Anchorage
Equal Rights Comm'n</u>, 220 F.3d 1134, 1138 (9th Cir. 2000) (en
banc)). The court should avoid both premature adjudication and
entanglement in abstract disagreements. <u>Abbott Labs. v. Gardner</u>,
387 U.S. 136, 148 (1967) *overruled on other grounds by* <u>Califano
v. Sanders</u>, 430 U.S. 99, 105 (1977).

Colusa seeks to have this court interpret the Compact to
address an injury that it has yet to suffer. Plaintiff has
failed to present any evidence that defendants failed to promptly
conduct a draw, either sua sponte or by request, when it had
available licenses. Rather, the undisputed evidence demonstrates
that the Commission held draws promptly after licenses became
available. While defendants were mistaken in their belief that
no license were available, the ambiguities that led to this
mistake have been resolved through this order. As such, Colusa's
purported injury is both hypothetical and speculative.

Therefore, with respect to Colusa's claim that defendants
refused to schedule and conduct a round of draws, defendants'
motion for summary judgment is GRANTED, and Colusa's motion for
summary judgment is DENIED.

/////

/////

/////

53

**F.  Counting Multi-Station Games as Equal to the Number of Terminals**

In its Second Claim for Relief in *Colusa II*, Colusa alleges that "under the Compact, a multi-station game is to be counted as a single Gaming Device," and thus, defendants' policy of counting multi-station games as equal to the number of their terminals is contrary to the terms of the Compact.  Defendants move for judgment on the pleadings on this claim, and Colusa moves for summary judgment.

Colusa argues that the definition of "Gaming Device" in the Compact is ambiguous.  As such, Colusa contends that the court should apply the gaming industry-wide technical standard that counts a multi-station game, in which a game outcome is determined by a single random number generator, as a single Gaming Device.  Defendants argue that the Compact's definition of "Gaming Device" is not ambiguous and includes each player position or terminal of a multi-station game.

"Contract interpretation begins with the language of the written agreement."  <u>Coast Fed. Bank</u>, 323 F.3d at 1038.  A contract must be construed "by reading it as a whole and interpreting each part with reference to the entire contract." <u>Tanadqusix</u>, 404 F.3d at 1205.  Extrinsic evidence is admissible only to prove a meaning to which the language is reasonably susceptible in the context of the entire integrated agreement. <u>Winet</u>, 4 Cal. App. 4th at 1167.

Section 2.6 of the Compact provides, in relevant part

> "Gaming Device" means a slot machine, including an electronic, electrical, or video device that, for consideration, permits: individual play with or against that device or the participation in any electronic,

electromechanical, electrical, or video system to which
that device is connected . . . .

(Compact § 2.6).  In some provisions, the Compact equates
terminals to Gaming Devices.  For example, § 4.3.1 provides that
a Tribe may potentially operate no more than "[a] number of
terminals equal to the number of Gaming Devices . . . ."  In
other provisions, the terms "Gaming Device" and "terminal" are
used interchangeably.  For example, § 5.1(a), which sets forth
the schedule for revenue distribution, provides that
contributions shall be paid based upon "the number of Gaming
Devices operated by the Tribe."  The chart following this
provision, however, refers to the number of "terminals" in lieu
of Gaming Devices.  Similarly, § 5.3 provides that the amount of
contribution is based upon "the total number of all Gaming
Devices operated by a Tribe during a given quarter."  The "Net
Win" is then "calculated by dividing the total Net Win from all
terminals."  (<u>Id.</u>)

     The court holds that under the unambiguous terms of the
Compact, each terminal of a multi-terminal game is to be counted
as a separate Gaming Device for licensing purposes.  The
definition of "Gaming Device" in the Compact includes an
electronic device that permits individual play with or against
that device or the participation in any system to which that
device is connected.  As such, the definition explicitly
contemplates that a Gaming Device is measured by the ability for
individual play through a terminal, either at a stand-alone unit
or at a multi-station unit.  Further, such an interpretation is
supported by the contract as a whole.  Throughout the Compact,

the term Gaming Device is equated to or used interchangeably with the term terminal. Thus, in order to interpret each part of the Compact with reference to the entire contract, the only reasonable interpretation of the Compact language is to count each terminal or player position as a "Gaming Device."

Colusa, relying upon definitions set forth by Gaming Laboratories International ("GLI"), an independent gaming test laboratory, contends that the Compact language is ambiguous and thus, should be construed against defendants as the drafters. Specifically, the GLI's definition provides that a Gaming Device unit has only one random number generator, controlled by the master terminal, but may have more than one player terminal. (DUF ¶ 60). Colusa's expert, Richard H. Williamson ("Williamson"), asserts that "California's uniform treatment of all multi-station electronic games is both arbitrary and incorrect, as it fails to consider distinct differences between" the random number generators available and the interdependency of patron play in electronic multi-station games. (Ex. A to Decl. of Richard H. Williamson in Supp. of Pl.'s Mot. for Summ. J. ("Williamson Decl") [Docket #59-9], filed Jan. 20, 2009, at 4). However, Williamson also acknowledges that there is no consistency across jurisdictions regarding how multi-station games are categorized, counted, or reported for revenue purposes. (Id. at 6). Rather, "the counting methodology applied in each case is highly situational and driven more by the exigencies of each jurisdiction than any applicable technical standard." (Id.) Accordingly, Colusa's reliance on technical, industry definitions does not render the plain language of the Compact, which focuses

on the number of terminals as opposed to random number generators, ambiguous. Therefore, the extrinsic evidence relating to GLI and Colusa's expert testimony is not relevant to interpretation of the Compact.

Colusa also argues that in or around September 2001, then Director of the Attorney General's Division of Gambling Control, Harlan Goodson ("Goodson"), informed the Director of Tribal Gaming Agency of the Morongo Band of Mission Indians ("Morongo") that the State would not object to multistation games being counted as single Gaming Device licenses so long as the game did not have more player positions than would be found in the traditional format of the same game. (Decl. of Jerry Schultze ("Schultz Decl.") [Docket #59-5], filed Jan. 20, 2009, at 1-2.) Assuming *arguendo* that these statements are admissible as admissions attributable to defendants, they do not raise ambiguity with respect to the plain language of the Compact. Goodson's statements were not binding upon defendants. (See Pl.'s Response to Def.'s Objections [Docket #86-2], filed Feb. 13, 2009, ¶ 10 ("Defendants' objection, that Goodson's statements are not binding upon the State, even if a correct statement of the law, goes to the weight of the evidence . . . .")); see also Indep. Roofing Contractors v. Cal. Apprenticeship Council, 114 Cal. App. 4th 1330, 1338 (2003) (holding that the conduct of a subordinate body could not give rise to estoppel); City of Long Beach v. Mansell, 3 Cal. 3d 462, 493 (1970) ("[A]n estoppel will not be applied against the government if to do so would effectively nullify a strong rule of policy, adopted for the

benefit of the public.").[31]  Furthermore, sometime between 2002
and 2003, the California Attorney General's Office issued an
informal advisory opinion that provided that each player station
of a multi-station game should be counted as a separate Gaming
Device under the Compact. (Schultz Decl. at 2).  Thus, Goodson's
statements did not necessarily represent the position of
defendants at all relevant times.  Moreover, there is no evidence
that Goodson or any other state actor ever made such
representations to Colusa.  As such, to the extent that Colusa
contends that the subsequent course of conduct between the
parties lends credibility to its definition of a Gaming Device,
Colusa has failed to present evidence of its, as opposed to
Morongo's, course of conduct with the state.  Therefore, this
evidence also fails to render the language of the Compact
ambiguous.[32]

     Accordingly, because the plain and unambigous language of
the Compact defines a Gaming Device as a single terminal or
player position, defendants' motion for judgment on the pleadings
is GRANTED, and Colusa's motion for summary judgment is DENIED.
/////

_____

[31]    The parties have presented evidence that, at the time
the Compact was negotiated, the State sought to limit the growth
of Class III gaming. (See Ex. A to Supp. Forman Decl. at 37:17-
38:12; Norris Decl. ¶ 15).

[32]    Colusa also argues that any valid policy reasons for a
narrow reading of the definition of "Gaming Device" in the
Compact cease to exist because the State has entered into amended
compacts with other tribes that allow for unlimited devices.
However, in interpreting the language of a contract, the court
cannot rely upon changed conditions and policies that did not
exist when the parties entered into the contract.  Moreover,
these amended compacts were accompanied with increased
restrictions and revenue sharing. (Defs.' Request for Judicial
Notice [Docket #80-5], filed Feb. 6, 2009).

58

**CONCLUSION**

For the reasons stated above, the court makes the following orders:

(1) Defendants' motion to dismiss Picayune's complaint in intervention is DENIED.

(2) With respect to Colusa's First Claim for Relief in *Colusa I*, regarding Colusa's priority in the draw process, defendants' motion for judgment on the pleadings is DENIED, and Colusa's motion for summary judgment is GRANTED.

(3) With respect to Colusa's Second Claim for Relief in *Colusa I* and Picayune's sole Claim for Relief, regarding the number of gaming devices authorized by the Compact, defendants' motion for summary judgment is DENIED, and Colusa's and Picayune's motions for summary judgment are GRANTED.

(4) With respect to Colusa's Third Claim for Relief in *Colusa I*, regarding defendants' retention of license fees, defendants' motion for summary judgment is GRANTED, and Colusa's motion for summary judgment is DENIED.

(5) With respect to Colusa's Fourth Claim for Relief in *Colusa I*, regarding the Commission's authority to administer the draw process, defendants' motion for judgment on the pleadings is GRANTED, and Colusa's motion for summary judgment is DENIED.

(6) With respect to Colusa's First Claim for Relief in *Colusa II*, regarding defendants' refusal to schedule and conduct a round of draws, defendants' motion for summary judgment is GRANTED, and Colusa's motion for summary judgment is DENIED.

(7)   With respect to Colusa's Second Claim for Relief in *Colusa
      II*, regarding defendants' counting of multi-station games as
      equal to the number of their terminals, defendants' motion
      for judgment on the pleadings is GRANTED, and Colusa's
      motion for summary judgment is DENIED.

      IT IS SO ORDERED.

DATED: April 21, 2009.

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE