UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| CACHIL DEHE BAND OF WINTUN INDIANS OF THE COLUSA INDIAN COMMUNITY, a federally recognized Indian Tribe,<br><br>     Plaintiff,<br><br>PICAYUNE RANCHERIA OF THE CHUKCHANSI INDIANS, a a federally recognized Indian Tribe,<br><br>     Plaintiff in Intervention,<br><br>     v.<br><br>STATE OF CALIFORNIA; CALIFORNIA GAMBLING CONTROL COMMISSION, an agency of the State of California; and ARNOLD SCHWARZENEGGER, Governor of the State of California,<br><br>     Defendants.<br>_____/ | NO. CIV. S-04-2265 FCD KJM<br>(Consolidated Cases) |

----oo0oo----

This matter is before the court on defendants State of California, California Gambling Control Commission (the "Commission" or "CGCC"), and Governor Arnold Schwarzenegger's (collectively, the "defendants") motion for reconsideration, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure,[1] of the court's April 22, 2009 Memorandum and Order (the "April 22 Order"), granting in part and denying in part the parties' motions for summary judgment and motion for judgment on the pleadings as to six of the seven claims at issue in this litigation.  Specifically, defendants seek reconsideration of the court's determination of plaintiffs' claims regarding the size of the Gaming Device license pool under the 1999 Compact.  Plaintiff Cachil Dehe Band of Wintun Indians of the Colusa Indian Community ("Colusa") and plaintiff-intervenor Picayune Rancheria of the Chukchansi Indians' ("Picayune") (collectively, "plaintiffs") oppose the motions.  For the reasons set forth herein,[2] defendants' motion is DENIED.

/////

/////

---

[1] In their reply, defendants argue that this motion is, in effect, a motion under Rule 56(f)(2) for a continuance to conduct further discovery.  However, Rule 56(f)(2) allows for a party to move for a continuance *prior* to filing an opposition for summary judgment.  As the record reflects, the dispositive motions in this case have been extensively briefed by the parties and an order has been issued.  Thus, this is decidedly not a Rule 56(f)(2) motion.

[2] Because oral argument will not be of material assistance, the court orders this matter submitted on the briefs. E.D. Cal. Local Rule 78-230(h).

**BACKGROUND[3]**

Plaintiff Colusa is an American Indian Tribe with a governing body duly recognized by the Secretary of the Interior. Plaintiff-intervenor Picayune is also a federally recognized Indian tribe. Colusa and Picayune entered into similar Class III Gaming Compacts (the "Compacts" or "Compact") with the State of California (the "State") in 1999, which were ratified by the Legislature on September 10, 1999; both Colusa and Picayune's Compacts have been in effect since May 16, 2000. 55 other tribes (the "Compact Tribes") also executed virtually identical compacts with the State. At their core, these compacts authorize Class III gaming pursuant to certain restrictions.

The Compact sets a statewide maximum on the number of Gaming Devices that all Compact Tribes may license in the aggregate. (Id.) This statewide maximum is determined by a formula set forth in the Compact. (Id.; PUF ¶ 3.) Specifically, the Compact provides:

> The maximum number of machines that all Compact Tribes in the aggregate may license pursuant to this Section shall be a sum equal to 350 multiplied by the Number of Non-Compact tribes as of September 1, 1999, plus the difference between 350 and the lesser number authorized under Section 4.3.1.

(Compact § 4.3.2.2(a)(1)). The parties disagreed over the total number of Gaming Device licenses authorized by this equation.

In the April 22 Memorandum and Order, the court set forth the following facts that were relevant to plaintiffs' claims regarding the license pool:

---

[3] The facts of this case are set forth fully in the court's April 22 Order. (April 22 Order [Docket # 102], filed Apr. 22, 2009).

3

After the April 1999 meeting between Davis and the federally recognized tribes, three main groups of tribes coalesced for the purpose of conducting compact negotiations with the State. (Supp. Decl. of George Forman ("Supp. Forman Decl.") [Docket #98], filed Apr. 8, 2009, ¶ 5). Colusa and Picayune were part of the largest group, the United Tribes Compact Steering Committee (the "UTCSC"), which consisted of more than 60 tribes located throughout California. (Id.) Colusa's counsel, George Forman, was one of the tribal attorneys designated to participate in negotiations as a spokesperson for the UTCSC tribes. (Id. ¶ 6). Judge William A. Norris ("Norris"), then Special Counsel to Governor Davis for Tribal Affairs, acted as the lead negotiator for California. (Decl. of William A. Norris ("Norris Decl.") [Docket #95-3], filed Mar. 19, 2009, ¶ 2). Judge Shelleyanne W.L. Chang ("Chang"), then Senior Deputy Legal Affairs Secretary for the Office of Governor Gray Davis, assisted with negotiations. (PUF ¶ 1).

Negotiations began in April 1999. (Id. ¶ 7). On May 26, 1999, Norris negotiated with the USTSC regarding a discussion document prepared by the state and submitted to the tribes on May 21, 1999. (Id. ¶¶ 8-9). During this negotiation, Norris conveyed the Governor's concern about limiting growth. (Ex. A to Supp. Forman Decl. at 37:17-38:12). However, Norris agreed that he, on behalf of the Governor, had "grave reservations, if not opposition, to a cap in the aggregate." (Id. at 37:1-2). Negotiations continued throughout the summer of 1999. (Norris Decl. ¶¶ 9-10). Norris asserts that during the compact negotiations in August and September 1999, the State's negotiations team made itself available to meet with every tribal representative who wanted to participate in the ongoing negotiations. (Id. ¶ 10).

During the negotiating process, Norris asserts that he repeatedly advised the tribes and their attorneys that a statewide cap of 44,798 Gaming Devices, including those already in operation by tribes, could not be exceeded. (Id. ¶ 15). Wayne R. Mitchum, Chairman of the Colusa Indian Community Council at all relevant times, concedes that the State's negotiating team represented that the Governor was committed to imposing reasonable limits on the expansion of gaming in California; however, per-tribe and statewide limits on Gaming Devices was not proposed until early September 1999. (Decl. of Wayne R. Mitcum ("Mitchum Decl") [Docket #59-6], filed Jan. 20, 2009, ¶¶ 1, 10). In order to address objections that the Compact inequitably benefitted tribes who had unlawfully operated substantially more than 350 Gaming Devices prior to entering into a compact, Norris and Chang drafted § 4.3.2.2(a)(1), which sets forth an

aggregate pool of available licenses. (Norris Decl. ¶¶ 15-16). Meanwhile, the USTSC held extensive internal discussions about fair and appropriate minimum allocations of gaming devices, how to set per-tribe maximum limits, and how to allocate a limited number of gaming devices. (Mitchum Decl. ¶ 12).

On September 9, 1999, Norris and Chang presented the draft of § 4.3.2.2 to a group of tribal attorneys who had played key roles in the negotiating process. (Id. ¶ 17). While one of these attorneys, Jerome Levine, was a tribal representative for the USTSC, (Ex. A to Supp. Forman Decl. at 2), there is no evidence that he was acting on behalf of the USTSC. Later that evening, Norris presented the entire draft compact to the assembled representatives of the California Indian tribes for approval. (Norris Decl. ¶ 18). He asserts that no questions were asked concerning the number of Gaming Devices authorized under the compact. (Id.) Mitchum asserts that he heard tribal leaders and other representatives ask the State's negotiators to explain the meaning, but the State's negotiators refused to explain it. (Mitchum Decl. ¶ 16). The State's negotiating team announced that tribal representatives had until approximately 10:00 p.m. that evening to accept the proposal. (Mitchum Decl. ¶ 13). This deadline was later extended until midnight. (Id.)

Once the State's negotiators left the room, Mitchum participated in an extensive discussion with the other tribal leaders and attorneys about how many Gaming Devices the proposed compact allowed. (Id. ¶ 17). Mitchum understood the compact to authorize approximately 56,000 Gaming Device licenses in addition to those already being operated by tribes. (Id.) Mitchum signed the required letter of intent on Colusa's behalf before expiration of the deadline. (Id. ¶ 13).

On or about September 10, 1999, at the request of the Governor's Press Office, Chang prepared an information sheet entitled, "Total Possible Number of Slot Machines Statewide Under the Model Tribal-State Gaming Compact Negotiated by Governor Davis and California Indian Tribes." (PUF ¶ 5). The Information Sheet was made available to the news media and described the purported intent of § 4.3.2.2(a)(1) of the Compact to authorize a total of 44,448 slot machines statewide, including those already in operation. (See PUF ¶ 6). As such, the Compact allowed for 23,450 additional licenses. (PUF ¶ 6). Chang asserts that the Governor's Office received no complaints or comments concerning the accuracy of the press release. (PUF ¶ 8).

5

> By letter dated November 9, 1999, Elizabeth G. Hill ("Hill"), writing for the Legislative Analyst, determined that § 4.3.2.2(a)(1) authorized 60,000 machines in addition to those already in operation, for a total in excess of 113,000 machines. (Stip. R. at 60-62). Hill, however, cautioned that "different interpretations of the language in the compact could result in significantly different totals." (Stip. R. at 61). Subsequently, by letter dated December 6, 1999, Hill determined that the total amount of machines authorized statewide was 61,700, including those authorized under the Compact and those in operation, based upon the proposed assumption that § 4.3.2.2(a)(1) applies only to [16] tribes. (Stip. R. at 64).
>
> By a letter to Sides dated May 10, 2000, Norris and Peter Siggins ("Siggins"), the Chief Deputy Attorney General, stated that the total number of devices authorized statewide was 45,206, and that 15,400 licenses were available under the Compact for the draw. (Stip. R. at 65-67). However, between May 15, 2000 and February 28, 2001, Sides issued 29,398 Gaming Device Licenses to 38 Compact tribes. (Stip. R. at 80).
>
> By letter to Governor Davis, the Chairman of the Commission, and the Attorney General, dated July 31, 2001, Picayune and other Compact tribes addressed the "need for confirmation that the maximum number of machines that all Compact Tribes in the aggregate may operate pursuant to the licenses issued per the Tribal-State Compact § 4.3.2.2, is in excess of 113,000." In the alternative, the letter stated that the parties needed to otherwise determine the number of licenses available in the pool. (Ex. O to Decl. of John Peebles ("Peebles Decl.") [Docket #70], filed Jan. 28, 2009).
>
> In June 2002, after reviewing various formulations including those advanced by the Legislative Analyst, the Commission determined that the license pool authorized by the Compact authorizes 32,151 Gaming Devices. (Stip. R. at 87). The Commission's report relies upon the same formulation relied upon by defendants in this litigation. (Stip. R. at 86-87). However, the Commission noted that a different formulation, advanced by the Legislative Analyst, yielded a total pool of 55,951 Gaming Devices and that yet another formulation, advanced by the Tribal Alliance of Sovereign Indian Nations, yielded a total pool of 64,283 Gaming Devices. (Stip. R. at 87). In 2003, Colusa sought to negotiate with the state regarding its interpretation of § 4.3.2.2. (Stip. R. at 92-94).

(April 22 Order.)

6

1      After reviewing the submissions and arguments of the
2 parties, the court held that Colusa and Picayune's alternative
3 formulation,[4] which yielded a total statewide pool of 42,700, was
4 supported by the contract language and the principles of contract
5 interpretation.  First, the court noted that the circumstances
6 under which the Compact was entered into did not aide in
7 discerning the parties' intent; the submissions of the parties
8 revealed that there was no clear consensus between the parties
9 regarding the maximum number of Gaming Devices allowed under the
10 Compact at the time the agreements were executed.  Specifically,
11 defendants presented evidence, including the Norris declaration,
12 that the State's intention was to limit the aggregate number of
13 devices at approximately 45,000, including those already in
14 operation at the time the compacts were signed.  As such, only
15 approximately 23,000 devices would be authorized under the
16 Compact.  The court noted though that, significantly, no party,
17 including defendants, proffered an interpretation of the Compact
18 that substantiated this number.  Rather, defendant Commission
19 rejected Norris' interpretation of the Compact, which assumed
20 "that uncompacted tribes have permanently waived their right
21 under Compact § 4.3.1 to deploy up to 350 gaming devices
22 following entry into a Compact with the State," and the
23 Commission noted that such an interpretation contradicted the
24 express language of § 4.3.1.  As such, the court was not
25 persuaded that defendants' formulation was most reflective of the

---

[4] The "alternative formulation" was mentioned in a footnote in Colusa's moving papers and was further expounded upon by plaintiffs in their reply papers and at oral argument.  The court allowed the parties to submit supplemental briefing on this issue after the hearing.

parties' intent based upon piecemeal reliance on Norris' interpretations.

The evidence also demonstrated that there was no consistent course of conduct between the parties and that there continued to be debate about the number of devices authorized under the Compact after it was signed. Hill, on behalf of the Legislative Analyst, noted that the language could be interpreted to authorize up to an additional 60,000 Gaming Devices or approximately 60,000 Gaming Devices total. Norris and Siggins informed Sides that only approximately 15,000 licenses were available to be drawn as of May 10, 2000. However, almost 30,000 licenses were ultimately distributed to the tribes through the Sides process. Picayune, among other tribes, sought clarification of the license pool almost two years after entering into the Compact. Defendant Commission only clarified the State's current position with respect to the license pool in June 2002, after considering two other potential formulations that had been advocated by different entities or individuals. Accordingly, the court found that the extrinsic evidence did not reveal a plain intent or meaning that was either understood by the parties at the time the Compact was executed or followed by the parties in their subsequent dealings with one another.

Second, the court found that plaintiffs' alternative formulation provided a lawful, operative, definite, and reasonable interpretation of the Compact.

Third, the court found that among the three calculations proffered by the parties, the alternative formulation most accurately followed the language of § 4.3.2.2(a)(1), giving the

words their ordinary meaning.  While both defendants' and plaintiffs' other formulations forced a more strained reading of the Compact language, and, read out essential terms of the relevant Compact section, the interpretation adopted by the court gave each term its plain meaning.  Moreover, the alternative formulation was supported by the purpose of the latter half of the equation as clarified by defendants' counsel at oral argument.  Defendants' counsel stated that the second part of the equation relates to the "unused entitlement," referring to the devices that were authorized that were currently not being used by those tribes operating less than 350 devices as of September 1, 1999.  Defendants' counsel explained that the second part of the equation was meant to add those unused authorized devices into the available pool.  In order to fully account for these unused authorized devices, the equation should take into account those tribes who signed a compact but were not operating any licenses; the alternative formulation did.

Finally, the court found that the alternative formulation was consistent with the principle that ambiguities in the Compact are to be construed against the drafter.  While the parties disputed and continue to dispute the level of negotiation and input that Colusa and Picayune had in the formation of the Compact, it was undisputed that the State's negotiation team actually drafted the language in the Compact.

Therefore, for all of these reasons, the court concluded that the statewide license pool authorized 42,700 Gaming Devices.
/////
/////

**STANDARD**

An order that resolves fewer than all of the claims among the parties "is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Fed. R. Civ. P. 54(b); E.D. Cal. L.R. 78-230(k) (authorizing motions for reconsideration of "any motion [that] has been granted or denied in whole or in part"). Where reconsideration of a non-final order is sought, the court has "inherent jurisdiction to modify, alter or revoke it." United States v. Martin, 226 F.3d 1042, 1048-49 (9th Cir. 2000). Generally stated, reconsideration is appropriate where there has been an intervening change in controlling law, new evidence has become available, or it is necessary to correct clear error or prevent manifest injustice. See Sch. Dist. No. 1J Multnomah County, Oregon v. ACANDS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993).

In the absence of new evidence or a change in the law, a party may not use a motion for reconsideration to raise arguments or present new evidence for the first time when it could reasonably have been raised earlier in the litigation. Caroll v. Nakatani, 342 F.3d 934, 945 (9th Cir. 2003); see 389 Orange Street Partners v. Arnold, 179 F.3d 656, 665 (9th Cir. 1999). Motions to reconsider are also "not vehicles permitting the unsuccessful party to 'rehash' arguments previously presented." United States v. Navarro, 972 F. Supp. 1296, 1299 (E.D. Cal. 1997), *rev'd on other grounds*, 160 F.3d 1254 (9th Cir. 1998). Ultimately, a party seeking reconsideration must show "more than a disagreement with the Court's decision, and recapitulation of

the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden." United States v. Westlands Water Dist., 134 F. Supp. 2d 1111, 1131 (E.D. Cal. 2001).

**ANALYSIS**

Defendants move for reconsideration of the court's April 22 Order based upon a letter, dated September 8, 1999, concerning a meeting that purportedly took place between 58 tribes for the purpose of discussing and voting upon "a pooling concept for dealing with the allocation of machines." (Sept. 8 Letter, Ex. A to Decl. of Peter H. Kaufman in Supp. of Mot. for Reconsideration ("Kaufman Decl"), filed June 19, 2009). Defendants also move for the court to vacate its ruling to allow for limited discovery concerning Colusa and Picayune's participation in the September 8, 1999 meeting referenced in the letter. Colusa and Picayune contend that reconsideration and further discovery are unwarranted because (1) the September 8, 1999 letter is not newly discovered evidence; and (2) the information referenced in the September 8, 1999 letter is irrelevant.[5]

**A.   Newly Discovered Evidence**

Defendants contend that they received the previously unknown September 8, 1999 letter that is the basis for their motion on June 12, 2009 as part of documents supporting Rincon Band of Luiseno Mission Indian's ("Rincon") motion for summary judgment. (Kaufman Decl. ¶ 3). Colusa and Picayune, however, present

---

[5] Plaintiffs also contend that the letter is inadmissible. However, the court will not address the merits of this argument because, as set forth *infra*, defendants' motion would fail even if the letter was admissible.

11

evidence that defendants and their counsel possessed a copy of the letter since at least January 23, 2006 and that in any event, with due diligence, further discovery could have been sought by defendants prior to the filing and hearing of the dispositive motions.

The party moving for reconsideration based on allegations of newly-discovered evidence bears the burden of demonstrating that the evidence: "(1) is truly newly-discovered; (2) could not have been discovered through due diligence; and (3) is of such material and controlling nature that it demands a probable change in the outcome." Westlands, 134 F. Supp. 2d at 1131 n.45 (internal citations omitted). For purposes of a motion for reconsideration, evidence is not "new" if it was in the moving party's possession or could have been discovered prior to the court's ruling. Coastal Transfer Co. v. Toyota Motor Sales, 833 F.2d 208, 212 (9th Cir. 1098); see Westlands, 134 F. Supp. 2d at 1130. Further, it is well established that "the failure to file documents in an original motion or opposition does not turn the late filed documents in 'newly discovered evidence.'" Shalit v. Coppe, 182 F.3d 1124, 1132 (9th Cir. 1999) (quoting Sch. Dist. No. 1J, Multnomah County v. AcandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993)); see Hopkins v. Andaya, 958 F.2d 881, 887 n.5 (9th Cir. 1992) ("A defeated litigant cannot set aside a judgment because he failed to present on a motion for summary judgment all the facts known to him that might have been useful to the court.").

Defendants have failed to meet their burden of demonstrating that the September 8, 1999 letter is newly discovered evidence or

evidence that could not have been previously discovered through due diligence.[6]  Colusa presents evidence that defendants and their counsel received this document on January 23, 2006, as part of disclosures in similar litigation over the size of the Gaming Device license pool brought by Rincon.  Specifically, plaintiffs present evidence that the existence of the letter was disclosed in Rincon's "Notice of Service of Plaintiff's Initial Disclosure Statement" and served on California Deputy Attorney General Peter Kaufman ("Kaufman") on January 23, 2006.  (Decl. of Marjori J. Haberman ("Haberman Decl."), filed July 10, 2009, ¶ 2.)  Hard copies of all the documents listed in the disclosure statement were sent to Kaufman.  (Id.)  Subsequently, on March 16, 2007, the September 8, 1999 letter was listed in a filing with the United States District Court for the Southern District of California by Rincon as part of the "Proposed Documents for Administrative Record"; this filing was electronically served on Kaufman.  (Id. ¶¶ 4-5.)  Neither the January 23, 2006 documents nor the March 16, 2007 documents were returned to Rincon as undelivered or undeliverable.  (Id. ¶ 6.)  Rather, defendants admit that the September 8, 1999 letter was present in these two document productions.  (Defs.' Reply, filed July 31, 2009, at 12.)  Accordingly, the evidence demonstrates that defendant had

---

[6] As an initial matter, the letter itself sets forth that it was delivered "BY HAND DELIVERY" to Governor Gray Davis and Norris.  *Assuming arguendo* that this letter was actually received by the intended recipients, the state would have had knowledge of this letter since the time of its delivery in September 1999.  However, because there is no dispute that defendants had possession of this letter since 2006, the court need not speculate about such knowledge to reach its result.

possession of these documents over two years before the court heard the parties' dispositive motions in this litigation.

Defendants argue that Kaufman's failure to look at the documents in this related lawsuit should be excused because it was part of "two very large document productions." (Defs.' Reply at 12.) Defendants' argument is without merit. Throughout this litigation, all parties have acknowledged the similar litigation pending in other California district courts, including the litigation brought by Rincon, and the overlap in issues raised by the multiple suits. Indeed, on January 16, 2009, prior to the filing of the parties' dispositive motions in this case, defendants filed a motion to sever and transfer to this court Rincon's claim regarding the number of available Gaming Device licences under the 1999 Compact. (See Defs.' Mot. to Sever and Transfer to the E.D. Cal., Rincon Band of Luiseno Mission Indians v. Schwarzenegger, 04-CV-1151, [Docket # 243], filed Jan. 16, 2009.) Defendants argued that severance and transfer was warranted because Rincon presented "an identical claim regarding the license pool size" and consolidation with plaintiffs' action "would avoid parallel proceedings on the same claim before different district judges." (Id. at 4, 10-11 ("Indeed the factual and legal issues in the Colusa[] Tribe's challenge to the size of the license pool are similar, if not identical, to Rincon's – the claims involve identical Compact terms, similar Tribal-State negotiations, the same Compact negotiators . . . , and the same state agency . . . .). As such, failure by defendants' counsel to examine evidence that was in his possession for over two years from a case, presenting "similar,

14

if not identical" claims to those brought by plaintiffs in this action cannot be considered due diligence.

Moreover, the further discovery sought by defendants could have been completed through the exercise of due diligence. Defendants assert that they conducted only minimal and general discovery in pursuing a defense under Rule 19, which was ultimately rejected by the Ninth Circuit. Defendants also assert that they did not have any opportunity to conduct discovery concerning the claims prior to the hearing on the dispositive motions filed in this case. However, at no point following the Ninth Circuit's Mandate on November 14, 2008, did defendants request discovery. Rather, defendants sought consolidation of the Gaming Device license pool issue with later filed litigation in which motions for summary judgment had already been filed. Defendants voiced no objection nor filed any motion with respect to the dispositive motion deadline set in the consolidated cases. That defendants wished they had sought more discovery in hindsight is neither diligence nor grounds to reopen issues already extensively briefed and litigated by the parties.

Therefore, defendants have failed to meet their burden of establishing that the September 8, 1999 letter was newly discovered.

**B.    Materiality**

The crux of defendant's argument relating to the September 8, 1999 letter is that "[b]y indicating that greater negotiation of the license pool concept occurred between the State and tribes than the parties' earlier evidence indicated, the Crowell letter . . . calls into question the Court's reliance on the doctrine of

15

*contra proferentum*."  (Defs.' Mot. for Reconsideration, filed June 19, 2009, at 3.)  Assuming that defendants demonstrated that the September 8, 1999 letter was "newly discovered" evidence and that the letter is either admissible or would lead to admissible evidence regarding the referenced September 8, 1999 meeting,[7] such evidence is not of a material and controlling nature that would demand a probable change in the outcome.

First, the April 22 Order acknowledged that there was some level of negotiation between the parties.  Plaintiffs presented evidence that per-tribe and statewide limits on Gaming Devices were proposed in early September 1999; plaintiffs also presented evidence that there were extensive internal discussions among the prospective Compact tribes regarding fair and appropriate limits and distribution of the licenses.  However, the evidence submitted by plaintiffs and defendants did not demonstrate that there was any clear consensus regarding the maximum number of Gaming Devices authorized by the equation provided in the Compact.

The September 8, 1999 letter does not further clarify any mutual understanding between plaintiffs and defendants.  At its core, the letter sets forth five tribes' opposition to a "pooling concept for dealing with the allocation of machines."  (Sept. 8 Letter at 1.)  It does not mention any numerical limits on the total number of Gaming Devices to be provided under the Compact,

---

[7] The letter is most likely unauthenticated hearsay that does not fit into any exception. Defendants' argument that the letter should be admissible under Federal Rule of Evidence 807, the residual hearsay exception, is unpersuasive.

16

nor does it mention the equation at issue in the Compact.[8] Moreover, the letter makes no mention of whether Colusa or Picayune were even in attendance at the meeting referenced. Nor does the letter reference any further negotiations between the prospective Compact tribes themselves or between the prospective Compact tribes and the State. As such, the letter does not shed any additional light on the mutual intention of the parties regarding the total number of licenses available under the Compact nor does it give rise to a reasonable belief that further discovery could lead to relevant evidence on the issue.

Second, in their motion for summary judgment, defendants did not dispute that the meaning of § 4.3.2.2(a) was unclear and susceptible to varying interpretations. (April 22 Order at 38.) Nothing in the September 8, 1999 letter changes the undisputed fact that defendants drafted the compact.

Third, application of the doctrine of *contra proferentum* was not the only basis for the court's decision. Indeed, as set forth above, the court held that the alternative formulation most accurately followed the language of § 4.3.2.2(a)(1) and gave words their ordinary meaning. This construction was also consistent with the underlying purpose as set forth by defendants' counsel at oral argument.

Therefore, the court concludes that neither the letter nor any discovery relating to the letter is material and controlling.
/////
/////

---

[8] Indeed, as set forth above, plaintiffs' evidence demonstrated that they were not presented with a draft of the relevant Compact language until September 9, 1999.

17

**CONCLUSION**

For the reasons stated above, defendants' motion for reconsideration and for further discovery is DENIED.

IT IS SO ORDERED.

DATED: August 11, 2009.

FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE